06-0283-cv
Reynolds v. DeBuono

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued March 5, 2007          Decided October 31, 2007)

Docket Nos. 06-0283-cv(L), 06-0284-cv(CON)

_____

Lakisha Reynolds, on her own behalf and on behalf of all others similarly situated, Georgina Bonilla, on her own behalf and on behalf of all others similarly situated, April Smiley, on her own behalf and on behalf of all others similarly situated, Lue Garlick, on her own behalf and on behalf of all others similarly situated, Adriana Calabrese, on her own behalf and on behalf of all others similarly situated, Jenny Cuevas, on her own behalf and on behalf of all others similarly situated, Elston Richards, on his own behalf and on behalf of all others similarly situated,

                              Plaintiffs-Appellees,

                    v.

Rudolph Giuliani, as Mayor of the City of New York, Jason Turner, as Commissioner of the New York City Department of Social Services, Brian J. Wing, as Commissioner of the New York State Office of Temporary and Disability Assistance, Barbara DeBuono, as Commissioner of the New York State Department of Health,

                              Defendants-Appellants.

_____

Before:
            CARDAMONE, STRAUB, and WALLACE*,
                  Circuit Judges.

_____

     Brian J. Wing, former Commissioner of the New York State Office of Temporary and Disability Assistance, and Barbara DeBuono, former Commissioner of the New York State Department of Health (collectively state defendants) appeal from the December 14, 2005 final judgment of the United States District Court for the Southern District of New York (Pauley, J.) enjoining state

defendants to, <u>inter alia</u>, supervise New York City officials' compliance with specified obligations under the Food Stamp Act, 7 U.S.C. §§ 2011 <u>et seq</u>., and the Medicaid Act, 42 U.S.C. §§ 1396 <u>et seq</u>.

Reversed and complaint dismissed.

Judge Straub concurs in part and dissents in part, in a separate opinion.

Judge Wallace concurs in a separate opinion.

_____

RICHARD DEARING, Assistant Solicitor General, New York, New York (Eliot Spitzer, Attorney General, Michael S. Belohlavek, Senior Counsel, Division of Appeals and Opinions, James M. Hershler, Assistant Attorney General of the State of New York, New York, New York, of counsel), <u>for State Defendants-Appellants</u>.

MARC COHAN, Henry A. Freedman Welfare Law Center, Inc., New York, New York (Petra T. Tasheff, Henry A. Freedman Welfare Law Center, Inc., New York, New York; Yisroel Schulman, Constance P. Carden, Randal S. Jeffrey, New York Legal Assistance Group, New York, New York; Scott A. Rosenberg, Christopher D. Lamb, Hwan-Hui Helen Lee, The Legal Aid Society, Civil Division, New York, New York; Kenneth Rosenfeld, Mary Ellen Burns, Northern Manhattan Improvement Corp., New York, New York, of counsel), <u>for Plaintiffs-Appellees</u>.

_____

_____

*     Hon. J. Clifford Wallace, United States Court of Appeals for the Ninth Circuit, sitting by designation.

CARDAMONE, Circuit Judge:

Ordinarily the state and federal governments, under whose parallel jurisdiction we all live, rub along together pretty well. When they conflict, it is unlike when "ignorant armies clash by night" as Matthew Arnold famously phrased it. Instead there is forethought, policy considerations and, as here, legal argumentation. This appeal presents an occasion when the powers confided to the federal courts and those matters reserved to the states conflict. In the shift made ten years ago by Congress from an emphasis on welfare and food stamps to a focus on employment as a solution to long term poverty, the State of New York delegated the transition to the City of New York, but retained the power to supervise the City's administrator of its changing assistance programs. New York City responded to the new mandate by revamping its infrastructure and policies to encourage welfare applicants to find jobs. Undoubtedly, the reforms posed an enormous administrative challenge to the City.

In December 1998 seven welfare applicants (together with other class members where appropriate, plaintiffs or appellees) brought a putative class action under 42 U.S.C. § 1983 on behalf of all New York City residents who have sought, are seeking or will seek to apply for food stamps, Medicaid or cash assistance at the City's job centers. The complaint was lodged against defendants Rudolph Giuliani, former Mayor of New York City and Jason Turner, former Commissioner of the New York City Department of Social Services (collectively City or city defendants), as

2

well as Brian J. Wing, former Commissioner of the New York State Office of Temporary and Disability Assistance, and Barbara DeBuono, former Commissioner of the New York State Department of Health (collectively state, state defendants or appellants), each in his or her official capacity. Plaintiffs alleged that the City engaged in unlawful conduct aimed to discourage and deter plaintiffs from obtaining benefits to which they were entitled and that the state failed to properly oversee and supervise the City's administration of assistance programs.

Almost seven years later, the United States District Court for the Southern District of New York (Pauley, J.) awarded plaintiffs permanent injunctive relief, directing city defendants to comply with specified provisions of federal and state law and directing state defendants to supervise the City's adherence to the injunction. Initially all the defendants appealed the judgment, but the City withdrew its appeal prior to oral argument before this Court. We are left then with the state defendants' challenge to the district court's judgment. We agree with appellants' contention that the record before us does not support the imposition of liability on the state or warrant the issuance of a permanent injunction against it.

BACKGROUND

The Food Stamp Act, 7 U.S.C. § 2011 et seq., and the Medicaid Act, 42 U.S.C. § 1396 et seq., created cooperative federal-state programs aiming, respectively, to raise nutritional levels and furnish medical care to needy individuals. See 7

3

U.S.C. § 2011 (1999); 42 U.S.C. § 1396 (2003). The programs are implemented by state and local agencies under the aegis of the United States Department of Agriculture (food stamps) and the United States Department of Health and Human Services (Medicaid). 7 U.S.C. § 2020(a), (d) (1999); 42 U.S.C. §§ 1396, 1396c (2003).

In 1996 Congress passed the Personal Responsibility and Work Opportunity Reconciliation Act, 42 U.S.C. § 601 et seq. (2003) (Welfare Reform Act), and set in motion dramatic changes in the delivery of welfare benefits nationwide. Notably, the Welfare Reform Act introduced the Temporary Assistance to Needy Families program with the express purpose of minimizing dependence on governmental benefits by promoting employment. See 42 U.S.C. §§ 601(a)(2), 602(a) (2003). The new program contained mandatory work requirements and time limits on eligibility for benefits. See, e.g., 42 U.S.C. § 602(a)(1)(A)(ii).

A. District Court Findings as to City Defendants' Non-Compliance

The New York City agency in charge of local implementation of food stamp, Medicaid and cash assistance programs is the Human Resources Administration (city agency). The city agency processed welfare applications at 31 income support centers until 1998, at which time it began to convert the income support centers into job centers in response to the new federal policy reflected in the Welfare Reform Act. The aptly named job centers encouraged applicants to find work and required them to undergo a rigorous application process, including interviews with financial and employment planners. Early evidence suggested a "culture of

4

improper deterrence" prevailed at the newly converted job centers, which was reflected in a decline in the number of applicants who received benefits from a City facility after its conversion to a job center.

In the course of this litigation, the City audited 29 income support and job centers to assess their compliance with federal and state law (September 2000 audit). On the basis of the September 2000 audit and other performance measures, the district court determined city defendants violated various rights secured to plaintiffs by federal law in four ways.

First, the City failed to provide a significant portion of eligible applicants with expedited food stamps within the mandated period of seven days. See 7 U.S.C. § 2020(e)(9) (1999); 7 C.F.R. § 273.2(i)(3)(i) (2007). Second, although the City was required to make separate determinations with regard to applicants' eligibility for food stamps and Medicaid after their applications for cash assistance were denied, see 7 U.S.C. §§ 2014(b), 2020(i)(2) (1999); 7 C.F.R. § 273.2(b)(3) (2007); 42 U.S.C. § 1396a(a)(8) (2003); 42 C.F.R. §§ 435.906, 435.913 (2006), such determinations were made infrequently. Third, half of the withdrawn applicants audited were found to have been improperly withdrawn as a result of the City's mishandling of notices and records. See 42 C.F.R. § 435.913 (2006), 7 C.F.R. § 273.2(c)(6) (2007). Fourth, the City frequently failed to give adequate and complete notices to applicants regarding eligibility decisions, in violation of the plaintiffs' due process rights

5

under the Fourteenth Amendment and in violation of the regulations.  See U.S. Const., amend. XIV, § 1; 7 C.F.R. § 273.10(g)(1) (2007); 42 C.F.R. §§ 435.911, 435.912 (2006).

## B.   The State Defendants

The Food Stamp and Medicaid Acts authorize the states to vest local agencies with responsibility for day-to-day administration of these benefits programs.  See 7 U.S.C. § 2012(n) (1999) (defining State agency to include counterpart local agencies "in those States where such assistance programs are operated on a decentralized basis"); 42 U.S.C. § 1396a(a)(5) (2003) (requiring each state to designate a "single State agency" to "administer or to supervise the administration of [the State's] plan").  The acts and their implementing regulations make participating states responsible for supervisory tasks, including the development of plans for statewide implementation of the programs, 7 U.S.C. § 2020(d); 42 U.S.C. § 1396a(a)(5), monitoring and evaluation of local agencies' performance, 7 C.F.R. § 275.5 (2007); 42 C.F.R. § 435.903(a) (2006), and corrective action to reduce deficiencies in local administration, 7 C.F.R. §§ 275.16-.19 (2007); 42 C.F.R. § 435.903(b) (2006).

New York State conducts its food stamp and Medicaid programs on a decentralized basis through 58 local services districts -- one of which is New York City -- under the supervision of the Office of Temporary Disability Assistance and the Department of Health.  It is undisputed that both of these state agencies took

numerous steps toward improving the City's administration of its benefits programs.

## C. District Court Proceedings

On December 16, 1998 the named plaintiffs brought a putative class action under 42 U.S.C. § 1983, alleging that the city defendants deterred families and individuals from applying for food stamps, including expedited food stamps, and Medicaid benefits; failed to make separate and timely determinations as to applicants' eligibility for Medicaid, food stamps and cash assistance; and failed to inform beneficiaries regarding the status of their applications. The complaint further asserted that state defendants' failure to properly oversee the City's administration of the food stamp and Medicaid programs violated plaintiffs' rights under the respective acts and under the Due Process Clause of the Fourteenth Amendment. The district court issued a preliminary injunction in January 1999 requiring the city defendants to comply with the federal and state laws relied on by plaintiffs and enjoining the City from converting income support centers into job centers, pending the district court's approval of a corrective plan relating to the job centers. Reynolds v. Giuliani(Reynolds I), 35 F. Supp. 2d 331, 347-48 (S.D.N.Y. 1999).

In May 1999 the district court approved the City's corrective plan and modified the injunction to allow the city defendants to convert three income support centers into job centers. Reynolds v. Giuliani(Reynolds II), 43 F. Supp. 2d 492,

498 (S.D.N.Y. 1999). To obtain further relief from the injunction, the district court required city defendants to prepare statistical evidence showing that the improvements set forth in the corrective plan had materialized. Id.

In July 2000 the district court determined the City's most recent evidence was incomplete and unreliable and denied its motion to vacate the injunction. Reynolds v. Giuliani (Reynolds III), 118 F. Supp. 2d 352, 377, 380 (S.D.N.Y. 2000). In the same decision, the district court granted plaintiffs' motion to certify as a class all New York City residents who have sought, are seeking, or will seek to apply for food stamps, Medicaid, or cash assistance at a job center. Id. at 392.

At this point in the litigation, plaintiffs' action against state defendants was not being vigorously prosecuted. Before the district court issued the preliminary injunction, plaintiffs conceded that injunctive relief against the state defendants at that time would be premature. Reynolds I, 35 F. Supp. 2d at 340 n.7. Indeed, even later, in the preparation of their pre-trial memo, plaintiffs did not assert any claims against the state defendants.

As a result, the state defendants moved to dismiss the complaint against them, asserting, inter alia, that plaintiffs failed to allege facts on which relief could be granted. In Reynolds III, the district court rejected the state defendants' arguments and denied their motion. 118 F. Supp. 2d at 392. Importantly, the district court held that the state defendants

8

were liable on a theory of non-delegable duty, under which theory the City's violations gave rise, by operation of law, to corresponding claims against the state defendants. Id. at 386.

In February 2001 plaintiffs consented to vacatur of that portion of the preliminary injunction that stayed the conversion of income support centers into job centers. In April 2001 the district court held a bench trial at which it assessed new evidence, including the September 2000 audit. Following its memorandum opinion in February 2005, Reynolds v. Giuliani (Reynolds IV), No. 98 Civ. 8877, 2005 WL 342106 (S.D.N.Y. Feb. 14, 2005), the trial court issued its final judgment on December 14, 2005 enjoining the City to comply with specified provisions of New York State law, the Food Stamp Act and the Medicaid Act and their implementing regulations. Reynolds v. Giuliani (Reynolds V), No. 98 Civ. 8877, 2005 WL 3428213 (S.D.N.Y. Dec. 14, 2005). The state defendants were directed in the judgment to supervise the City's compliance with the injunction and were assigned specific monitoring duties, such as semi-annual reviews of the City's performance and regular reporting to plaintiffs.

The state defendants appeal the district court's December 14, 2005 judgment.

DISCUSSION

Following a bench trial, we review the district court's conclusions of law de novo and its factual findings for clear error. MacWade v. Kelly, 460 F.3d 260, 267 (2d Cir. 2006). The trial court's grant of a permanent injunction is reviewed for

9

abuse of discretion.  <u>Kapps v. Wing</u>, 404 F.3d 105, 122-23 (2d Cir. 2005).

### I  Plaintiffs' Theories of State Liability

Following the withdrawal of the City's appeal, state defendants declined to challenge the district court's conclusion that the city defendants violated the Food Stamp and Medicaid Acts or to dispute its holding that certain provisions of these acts give rise to federal rights enforceable under 42 U.S.C. § 1983.  In short, state defendants maintain that whatever injury plaintiffs have suffered as a result of a violation of their rights under these Acts is a subject for redress from the City of New York.  Hence, the single question remaining before us is whether state defendants are liable to plaintiffs for the city defendants' violations of the Food Stamp Act, Medicaid Act, their implementing regulations or the Due Process Clause of the Fourteenth Amendment.

As numerous theories of liability against the state have appeared in the course of this litigation, we pause to clarify those sufficiently presented to warrant review.  First, we note plaintiffs' cause of action was asserted and defended on appeal under 42 U.S.C. § 1983.  The district court's description of the complaint as asserting private rights of action in a different legal context does not accord with our reading of plaintiffs' complaint.  In both its preliminary and jurisdictional statements, the complaint makes clear that plaintiffs intended to bring this action under § 1983.  In their appeal brief,

10

plaintiffs proffer no argument as to a separate vehicle for their claims, except one stray assertion that the state's duty to supervise is enforceable outside § 1983. Accordingly, we proceed to assess the state defendants' liability under § 1983.

The first theory proposed by plaintiffs, but never explored by the district court, was not preserved on appeal. We have already observed that the Food Stamp Act, Medicaid Act and their implementing regulations outline a state's supervisory duties. Plaintiffs suggested in district court that these statutory provisions gave them rights to supervision enforceable against the state defendants. On appeal, however, plaintiffs made no effort to anchor liability on these supervision-specific provisions and labeled "irrelevant" appellants' argument that 42 U.S.C. § 1396a(a)(5) does not create privately enforceable rights of action. Accordingly, we think a theory of plaintiffs having private rights of action against the state under the Food Stamp Act and the Medicaid Act has been abandoned.

A second theory plaintiffs assert to hold state defendants liable received passing attention from the district court. Under Monell v. Dep't of Social Servs. of the City of N.Y., 436 U.S. 658 (1978), state defendants may be liable when a state policy or custom results in the violation of plaintiffs' federal rights. Plaintiffs maintain the state's failure adequately to supervise city defendants is persuasive evidence of such a policy or custom.

11

A third theory, one which was adopted by the district court, grounds the state defendants' liability in their non-delegable duty to ensure the welfare programs are administered in compliance with federal law. By this logic, a state may delegate day-to-day administration to local entities, but it remains legally liable to plaintiffs for any non-compliance by its delegatee. We turn now to assess the second and third theories of liability in the context of § 1983 jurisprudence.

## II  Liability Under Monell

In Monell, the Supreme Court ruled for the first time that municipalities were liable under § 1983 to be sued as "persons" within the meaning of that statute, when the alleged unlawful action implemented or was executed pursuant to a governmental policy or custom. 436 U.S. at 691, 694; see also City of Canton v. Harris, 489 U.S. 378, 385 (1989). Section 1983 provides in relevant part

> Every person who, under color of any statute, ordinance, regulation, custom, or usage . . . subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983. In light of the statute's legislative history and language, Monell reasoned that § 1983 rejects the imposition of vicarious liability on a municipality for the torts of its employees as incompatible with § 1983's causation requirement. 436 U.S. at 691-94; see also City of Canton, 489 U.S. at 385

12

("Respondeat superior or vicarious liability will not attach under § 1983."); City of St. Louis v. Praprotnik, 485 U.S. 112, 122 (1987); Amnesty Am. v. Town of West Hartford, 361 F.3d 113, 125 (2d Cir. 2004).

An official capacity suit against a public servant is treated as one against the governmental entity itself. Monell, 436 U.S. at 690 n.55; Kentucky v. Graham, 473 U.S. 159, 169 (1985). Thus, a state official may be sued in his or her official capacity for injunctive or other prospective relief, but only when the state itself is the moving force behind the deprivation. Graham, 473 U.S. at 166, 169; Huminski v. Corsones, 396 F.3d 53, 70 (2d Cir. 2005).

### A. Applicability of Monell

Plaintiffs contend Monell's policy or custom requirement and its concomitant bar on respondeat superior liability are not applicable to them because they seek prospective relief only. They cite Chaloux v. Killeen, 886 F.2d 247 (9th Cir. 1989), which held that Monell did not govern an action for prospective relief against a county that enforced unconstitutional laws. Id. at 250. Chaloux is distinguishable from our case insofar as it dealt with a municipality's liability for state policy -- what one scholar coined "respondeat inferior liability," David J. Barron, Why (and When) Cities Have a Stake in Enforcing the Constitution, 115 Yale L. J. 2218, 2236 (2006) -- rather than a supervisor's responsibility for the actions of subordinates. Monell did not address directly this application of vicarious

13

liability and it is not relevant to the case at bar.  See id.; see also Chaloux, 886 F.2d at 251.

To the extent Chaloux proposes to exempt all claims for prospective relief from Monell's policy or custom requirement, we are not persuaded by its logic.  Monell draws no distinction between injunctive and other forms of relief and, by its own terms, requires attribution of misconduct to a municipal policy or custom in suits seeking monetary, declaratory or injunctive relief.  Monell, 436 U.S. at 690; see Dirrane v. Brookline Police Dep't, 315 F.3d 65, 71 (1st Cir. 2002); L.A. Police Protective League v. Gates, 995 F.2d 1469, 1477 (9th Cir. 1993) (Fletcher, J., concurring) ("Monell . . . simply holds that a municipality may not be sued at all unless the challenged conduct represents the official policy or custom of the municipality.").

We join several of our sister circuits in adopting the view that Monell's bar on respondeat superior liability under § 1983 applies regardless of the category of relief sought.  See Gernetzke v. Kenosha Unified Sch. Dist. No. 1, 274 F.3d 464, 468 (7th Cir. 2001) (stating predominant but not unanimous view that Monell's holding applies to claims seeking injunctive relief); accord Dirrane, 315 F.3d at 71 & n.4 (collecting cases).

B.  Failure to Supervise Claim

Municipal liability in Monell was based on the city's affirmative conduct, that is, its official policy requiring pregnant employees to take unpaid leaves of absence before such leaves were medically necessary.  436 U.S. at 660-61.

14

Nonetheless, the Supreme Court has left a narrow opening for § 1983 claims like the one we address here seeking liability based not on affirmative conduct but on a government official's failure to act. See, e.g., City of Canton, 489 U.S. at 387-92; id. at 394-95 (O'Connor, J., concurring in part and dissenting in part) ("Where . . . a claim of municipal liability is predicated upon a failure to act, the requisite degree of fault must be shown by proof of background events and circumstances which establish that the 'policy of inaction' is the functional equivalent of a decision by the city itself to violate the Constitution.").

Specifically, Monell's policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions. See Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737 (1989) (noting municipal liability may attach where policy maker acquiesces in longstanding practice that constitutes "standard operating procedure" of local government); Green v. City of N.Y., 465 F.3d 65, 80 (2d Cir. 2006). Such a pattern, if sufficiently persistent or widespread as to acquire the force of law, may constitute a policy or custom within the meaning of Monell. 436 U.S. at 690-91; Jeffes v. Barnes, 208 F.3d 49, 61 (2d Cir. 2000); Turpin v. Mailet, 619 F.2d 196, 201 (2d Cir. 1990).

15

It follows therefore that a government supervisor who fails to take obvious steps to prevent manifest misconduct is subject to suit under § 1983 in certain, limited circumstances. See City of Canton, 489 U.S. at 387. In City of Canton, the Supreme Court held a city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need. Id. at 390.

Although City of Canton addressed a claim of a failure to train, the stringent causation and culpability requirements set out in that case have been applied to a broad range of supervisory liability claims. See, e.g., Amnesty, 361 F.3d at 127 (failure to supervise); Berry v. City of Detroit, 25 F.3d 1342, 1354 (6th Cir. 1994) (failure to discipline). In Walker v. City of N.Y., 974 F.2d 293, 297-98 (2d Cir. 1992), we outlined the requirements that must be met before a local government or official's failure to act amounts to deliberate indifference. Plaintiffs are required to submit evidence that defendants knew to a moral certainty that the City would confront a given situation; the situation presented the City with a difficult choice or there was a history of its mishandling the situation; and the wrong choice by the City would frequently cause the deprivation of plaintiffs' rights. Id.

16

Walker, which decided an appeal from a dismissal on the pleadings, is best understood as establishing the circumstances that give rise to a defendant supervisor's duty to act or, more precisely, the circumstances under which a supervisor's failure to act triggers liability under § 1983. See id. at 294-95, 297-98. At later stages of litigation, a plaintiff must establish also that defendant breached its duty to act by failing to make meaningful efforts to address the risk of harm to plaintiffs. See Amnesty, 361 F.3d at 129-30 & n.10 (requiring plaintiffs to furnish evidence that training program was actually inadequate); Vann v. City of N.Y., 72 F.3d 1040, 1049 (2d Cir. 1995) (allowing inference of deliberate indifference where repeated complaints are followed by no meaningful attempt to investigate or forestall incidents).

Here, the state did respond to the City's non-compliance, and so plaintiffs faced a heavy burden of proof in showing that the state's response was so patently inadequate to the task as to amount to deliberate indifference. See, e.g., Sarus v. Rotundo, 831 F.2d 397, 401 (2d Cir. 1987) (requiring proof that failure to supervise was severe); Young v. City of Providence ex rel. Napolitano, 404 F.3d 4, 27 (1st Cir. 2005) ("[A] training program must be quite deficient in order for the deliberate indifference standard to be met: the fact that training is imperfect or not in the precise form a plaintiff would prefer is insufficient to make such a showing."). Such inadequacy must reflect a deliberate choice among various alternatives, rather than

17

negligence or bureaucratic inaction. Pembaur v. Cincinnati, 475 U.S. 469, 483-84 (1986). Further, as plaintiffs in the case at hand challenge a many-layered supervisory program spanning several years -- rather than an isolated incident of non-supervision -- they are required to identify with specificity the inadequacies giving rise to their claim. Cf. Amnesty, 361 F.3d at 127 n.8, 128 (not requiring plaintiff to specify obvious supervisory deficiency based on allegation that chief passively witnessed police brutality).

Plaintiffs must prove in the end that the state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations. Polk County v. Dodson, 454 U.S. 312, 326 (1981); see also City of Oklahoma v. Tuttle, 471 U.S. 808, 823 (1985) (plurality opinion) (requiring at minimum an "affirmative link" between policy and alleged violations); City of Canton, 489 U.S. at 391 ("[T]he identified deficiency . . . must be closely related to the ultimate injury."); Zahrey v. Coffee, 221 F.3d 342, 350 (2d Cir. 2000) (describing causation as an element that must be proved to hold a municipality liable under § 1983).

In sum, plaintiffs' claims against state defendants are governed by Monell's policy or custom requirement, which obligates plaintiffs to (1) establish state defendants' duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference under Walker; (2)

18

identify obvious and severe deficiencies in the state defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs. As we explain in a moment, we do not think plaintiffs successfully discharged that obligation.

### III  Liability Under a Non-Delegable Duty Theory

Plaintiffs maintained, and the district court agreed, the Food Stamp and Medicaid Acts imposed on participating states a non-delegable duty to administer the programs in such a manner that any state electing to operate its programs on a decentralized basis may only fulfill its statutory obligations by ensuring compliance by its local agencies.  Following this logic, the district court concluded that any violations detected in the City's administration of the programs gave rise, by operation of law, to corresponding claims against the state defendants. Reynolds III, 118 F.3d at 386.

This novel theory did not require the district court to base a finding of liability on any identified deficiencies in the state's supervision, to find the state defendants deliberately indifferent to the citizens of New York or constructively acquiescent to the City's misconduct, or to locate a causal link between the state's alleged sins of omission and the alleged violations.  In sidestepping Monell's rigorous culpability and causation standards, the district court's holding tumbled headlong into the error warned against by the Supreme Court and

19

imposed de facto respondeat superior liability -- a result rejected by Monell -- on the state defendants. See City of Canton, 489 U.S. at 392.

Plaintiffs' attempt to justify the evasion of Monell's rejection of vicarious liability is wholly unpersuasive. Plaintiffs neither dispute that the Food Stamp and Medicaid Acts authorize participating states to delegate the day-to-day administration of the programs, nor challenge New York State's decision to operate on a decentralized basis. Instead, they suggest the Food Stamp and Medicaid Acts allow states to delegate only at their peril. Although plaintiffs decline to state the argument so bluntly, and speak instead in terms of "ultimate responsibility," we understand their position to be that the statutes themselves render the states vicariously liable to plaintiffs. We see no support in the language of the Acts or our case law for the proposition that § 1983 claims arising under the Food Stamp or Medicaid Acts are exempt from the standards governing all other § 1983 claims.

As a threshold matter, plaintiffs have not provided us with any limiting principle to prevent their non-delegable duty theory from swallowing Monell whole. Neither the assertion that the state was the direct assignee of the task of administering the food stamp and Medicaid programs, nor the amorphous concept of ultimate responsibility, suffices to distinguish our case from countless others in which an employer is charged with certain duties, delegates those duties to his subordinates and remains

20

ultimately responsible to his superiors for the performance of the delegated tasks.

Plaintiffs seek support for their position in <u>Henrietta D. v. Bloomberg</u>, 331 F.3d 261 (2d Cir. 2003), where we located a duty to supervise on the part of the state implicit in the Rehabilitation Act of 1973, § 504, 29 U.S.C. § 794. <u>Id</u>. at 287. Although the rationale set out in that case might lend support to plaintiffs' non-delegable duty theory in a different context, <u>see id</u>. at 286-87, <u>Henrietta D.</u> is inapposite because it does not address § 1983 liability. Further, that case merely held that supervisory liability was a permissible basis for suit against a state and did not purport to establish a standard to govern its imposition on that basis. <u>See id</u>. at 287.

Both the district court and plaintiffs rely on <u>Robertson v. Jackson</u>, 972 F.2d 529 (4th Cir. 1992), in which the Fourth Circuit affirmed an injunction ordering the state commissioner responsible for supervision of Virginia's food stamp program to ensure compliance by local agencies. <u>Id</u>. at 532-34. Undoubtedly, <u>Robertson</u> provides a strong endorsement of plaintiffs' non-delegable duty theory but, as appellants' suggest, <u>Robertson</u>'s persuasiveness is greatly dampened by its complete silence on § 1983 limitations on municipal liability.

<u>Robertson</u>, in turn, draws significantly from cases and legislative history addressing a state's liability, not to welfare recipients, but to the federal agency responsible for national implementation of the food stamp program. <u>See id</u>. at

21

533-34; <u>Woods v. United States</u>, 724 F.2d 1444, 1447-48 (9th Cir. 1984) (holding state liable to United States Department of Agriculture for local violations of Food Stamp Act); <u>California v. Block</u>, 663 F.2d 855, 858 (9th Cir. 1981); H.R. Rep. No. 95-464, at 299 (1977), <u>as</u> <u>reprinted in</u> 1977 U.S.C.C.A.N. 1704, 2235 ("The state, however, remains ultimately responsible and is the unit with which the [United States Department of Agriculture] deals."). These sources merely imply that, by private or public arrangement, a supervisor may be held responsible to <u>his</u> supervisor for the shortcomings of his subordinates.

The district court's final judgment, insofar as it requires the state defendants to supervise the City without finding how the state defendants have previously failed in this duty, supplies further evidence of the earlier wrong turn in the court's reasoning. The injunction it issued operates as a general caution to do more or do better, thereby imposing prophylactic duties on the state that may or may not be related to the deprivations at bar. <u>See</u> <u>City of Canton</u>, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). In our view neither the district court's reasoning nor its judgment can be squared with controlling § 1983 case law.

IV State Defendants Not Liable Under Proper Legal Standard

A. <u>Inadequate Supervision</u>

Plaintiffs contend state defendants were deliberately indifferent under the test set out in <u>Walker</u> because they had knowledge of an obvious need for supervision and the risk of harm

22

to plaintiffs. We do not decide whether plaintiffs succeed under Walker in proving state defendants had a duty to act, nor whether any hypothetical inadequacies in the state's response can be linked to plaintiffs' injury, because plaintiffs cannot prove the state's supervision was patently inadequate.

The district court acknowledged the state's various measures to foster compliance by the City including reviews at each of the job centers, issuance of policy directives, and instructions to the city agency to step up its monitoring and reporting on identified areas of non-compliance. Reynolds IV, 2005 WL 342106, at *21. For example, in 2000 and 2001, the Office of Temporary Disability Assistance conducted reviews at all job centers and five income support centers in New York City. The state office reported the results of these reviews to the city agency and required it to submit quarterly reports until all outstanding issues were resolved. On the issue of separate determinations regarding an applicant's eligibility for food stamps, the Office of Temporary Disability Assistance issued a policy directive mandating such determinations be made. When the city agency failed to comply, the office required it to investigate and address the failure, as well as submit a plan for citywide implementation of the state's policy.

Similarly, the Department of Health, New York's designated single state agency under the Medicaid Act, responded to plaintiffs' allegations by issuing instructions to local districts to bring them into compliance and worked with city

23

defendants to review and approve corrective changes. The Department of Health clarified that applicants were entitled to separate eligibility determinations for Medicaid and required the city agency to monitor referrals for such determinations.

Against this evidence of the state's efforts, the plaintiffs note that the United States Department of Agriculture faulted New York State in November 1999 for its lack of effective oversight of the local agencies. We concur with the district court in characterizing the 1999 report as a benchmark against which the defendants' later efforts should be measured. Id. at *10 ("[P]laintiffs' reliance on prior reviews captures the world's largest welfare system in a still portrait and overlooks the City defendants' efforts toward compliance."). Later reports from the Department of Agriculture noted efforts and improvements made by New York's Office of Temporary and Disability Assistance, while also identifying areas requiring further corrective action.

Any inadequacy that may be found in the state's response stands in sharp contrast to the allegations of inaction and even encouragement of misconduct that provide grounds for supervisory liability in the typical case. State defendants did not sit on their hands in the face of an obvious need to act. See Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 418 (1997) (Souter, J., dissenting). They did not, as did the municipal defendant in Amnesty, stand idly by, let alone encourage, the City's non-compliance. 361 F.3d at 128; see also Jeffes, 208 F.3d at 63 (allowing inference of deliberate indifference from

24

evidence that supervisor observed abusive incident with a smile); Bolin v. Black, 875 F.2d 1343 (8th Cir. 1989); Gutierrez-Rodriguez v. Cartagena, 882 F.2d 553 (1st Cir. 1989). In short, there is little evidence showing the state to be deliberately indifferent.

Nonetheless, we do not hold that any action taken by a local government insulates it from supervisory liability. If a supervisor's steps are proven so meaningless or blatantly inadequate to the task that he may be said to be deliberately indifferent notwithstanding his nominal supervisory efforts, liability will lie. See, e.g., Vann, 72 F.3d at 1050 (reversing summary judgment against plaintiff in light of evidence that police "paid virtually no attention" to complaints relating to officers with history of abusive conduct); Ricciuti v. N.Y. City Transit Auth., 941 F.2d 119, 121, 124 (2d Cir. 1991) (vacating dismissal on pleadings where plaintiffs alleged current training was obviously inadequate); Fiacco v. City of Rensselaer, 783 F.2d 319, 330-31 (2d Cir. 1986) (finding deliberate indifference where chief of police conducted superficial investigations of citizen complaints and failed to discipline officers, record complaints or engage in any further review).

Here, however, there is no evidence to suggest that the state's phased efforts were meaningless or obviously inadequate, except the fact of the City's continued failure to comply with certain provisions of law. Contrary to the district court's and plaintiffs' suggestion, the extent of state defendants' ultimate

25

success in averting injury cannot be the legal measure of its efforts to do so, as such a standard is tantamount to vicarious liability. See Amnesty, 361 F.3d at 130 ("City of Canton unequivocally requires, however, that the fact-finder's inferences of inadequate training and causation be based on more than the mere fact that the misconduct occurred in the first place.").

Our view that state defendants' efforts to foster compliance preclude a finding of deliberate indifference finds support in our cases and those of our sister circuits addressing claims against supervisors who tried, but failed, to prevent injury to plaintiffs. See, e.g., Zahra v. Town of Southold, 48 F.3d 674, 685 (2d Cir. 1995) (rejecting § 1983 claim where defendant town had investigated complaint, notwithstanding plaintiff's unsubstantiated assertion that town's efforts were disingenuous); Grazier ex rel. White v. City of Philadelphia, 328 F.3d 120, 125 (3d Cir. 2003) (dismissing failure to train claim where some police training was provided absent evidence that such training was so inadequate as to amount to deliberate indifference); Liebe v. Norton, 157 F.3d 574, 578 (8th Cir. 1998) (holding that county's deliberate efforts to prevent inmate suicides contradicted claim it was deliberately indifferent to them); Palmquist v. Selvik, 111 F.3d 1332, 1345 (7th Cir. 1997) ("It is against these 'better or more' training scenarios that the Court warned in City of Canton."); Davis v. City of Ellensburg, 869 F.2d 1230, 1235 (9th Cir. 1989) (finding no deliberate

26

indifference where chief of police failed to remove problem police officers from active duty, but sent them to psychologist and monitored their progress).

The rationale underlying these cases is clear. A local government's liability under § 1983 must be based on its policy or custom under Monell. Where, as here, that policy incorporates the defendants' deliberate efforts to protect plaintiffs' rights, it cannot, at the same time, be deemed deliberately indifferent to those rights. See Liebe, 157 F.3d at 578. A natural presumption arises in such cases that any supervisory inadequacies are the result of negligence rather than deliberate choice.

## B. Policy Based on Acquiescence

Plaintiffs argue briefly that the state's alleged acquiescence to the City's pattern of misconduct represents an unofficial custom and thus renders the state defendants liable for suit under Monell. To the extent plaintiffs intend their unofficial custom allegation to provide a ground for liability independent of their failure to supervise claim, the former fails for the same reason we rejected the latter. State defendants took affirmative steps to investigate and correct the City's misconduct, including specific directions to the city agency to correct incidents of non-compliance. We cannot conclude the state defendants have tacitly authorized or constructively acquiesced to violations that it has vocally and actively opposed.

27

## C. Remand Serves No Useful Purpose

The district court did not discuss state defendants' liability under Monell. On review of a district court decision that rests on an improper legal standard and omits necessary factual and legal analysis, it is often appropriate to remand the case to the trial court for its reconsideration. See, e.g., Dandridge v. Williams, 397 U.S. 472, 475 n.6 (1970). But if the evidence before us admits only a single resolution of the controlling issue, remanding the case serves no useful purpose. See Stetson v. Howard D. Wolf Assocs., 955 F.2d 847, 850 (2d Cir. 1992) (deciding case despite trial court's application of erroneous legal standard where facts adequately supported result); cf. Abrams v. Interco Inc., 719 F.2d 23, 28 n.3 (2d Cir. 1983) (noting that upon discovery of legal error with respect to temporary injunctions, "the appellate court . . . generally will not simply remand to the district court but will act on its own"); accord Buffalo Courier-Express, Inc. v. Buffalo Evening News, Inc., 601 F.2d 48, 54, 57, 60 (2d Cir. 1979) (assuming "full power to review" factual record to determine whether legal test not considered by district court was satisfied). Here, "the record permits only one resolution of the factual issue." Pullman-Standard v. Swint, 456 U.S. 273, 292 (1982). As plaintiffs cannot prevail on the record before us, we bring this case, now in its ninth year, to a close by dismissing the complaint against state defendants.

28

V   Injunction Against State Defendants Was Abuse of Discretion

Having disposed of the substantive arguments for § 1983 liability against state defendants we turn finally to the injunctive remedy the district court imposed.

While we recognize that a district court has broad discretion in fashioning equitable relief, such discretion is not boundless and must instead be exercised in light of governing legal principles and is subject to thorough appellate review. Albemarle Paper Co. v. Moody, 422 U.S. 405, 416 (1975); Hodge v. Police Officers, 802 F.2d 58, 60 (2d Cir. 1986). Consequently, a grant of injunctive relief may be overturned if it is predicated, as here, on legal error. See Abrams, 719 F.2d at 28.

The authority to issue an injunction is an extraordinary and powerful one that is to be used sparingly and cautiously and only in a "clear and plain" case. Rizzo v. Goode, 423 U.S. 362, 378 (1976); Irwin v. Dixion, 50 U.S. (9 How.) 10, 33 (1850). Even greater caution is appropriate where a federal court is asked to interfere by means of injunctive relief with a state's executive functions, a sphere in which states typically are afforded latitude. Rizzo, 423 U.S. at 378-80; see also Huffman v. Pursue, Ltd., 420 U.S. 592, 603 (1975) (requiring federal courts to "abide by standards of restraint that go well beyond those of private equity jurisprudence" when asked to enjoin state officials). As Justice Holmes said "no injunction ought to issue against officers of a State . . ., unless in a case reasonably free from doubt . . ." Mass. State Grange v. Benton, 272 U.S.

29

525, 527 (1926). In such cases, we must keep in mind the "integrity and function" of state institutions, see Knox v. Salinas, 193 F.3d 123, 129-30 (2d Cir. 1999) (per curiam), as well as the delicate balance that must be maintained between a federal court's exercise of its equitable power and a state's administration of its own affairs, see Rizzo, 423 U.S. at 378-80. Writing for the Supreme Court in Hawks v. Hamill, 288 U.S. 52 (1932), Justice Cardozo explained

> Caution and reluctance there must be in special measure where relief, if granted, is an interference by the process of injunction with the activities of state officers discharging in good faith their supposed official duties. In such circumstances this court has said that an injunction ought not to issue "unless in a case reasonably free from doubt.". . . A prudent self-restraint is called for at such times if state and national functions are to be maintained in stable equilibrium. . . . Our process does not issue unless the path is clear.

Id. at 60-61.

Such federalism concerns underlie the instant litigation. Indeed, they are exacerbated by evidence of the state defendants' efforts to improve the City's compliance with federal law. It is often more difficult to discern a defendant's culpability if he has acted to prevent harm than where he has failed to act at all. Plaintiffs' claim that the state should have supervised more or differently put pressure on the district court to second guess the state's managerial decisions and priorities, a task for which courts are ill-suited. See City of Canton, 489 U.S. at 392.

30

In our view, the district court's decision made light of these considerations, and the permanent injunction it issued against the state reveals a deficit of the caution called for by the authorities just cited. In view of state defendants' affirmative supervisory steps, plaintiffs' inability to show defendants were deliberately indifferent to their needs, and the district court's reliance on a novel and untenable theory of liability, we are compelled to conclude that this case was neither clear nor plain, and certainly not reasonably free from doubt. Accordingly, the district court abused its discretion in issuing the injunction against state defendants and that portion of the injunction must be vacated.

## CONCLUSION

Accordingly, for the foregoing reasons, we reverse the district court's grant of an injunction against the state defendants, dismiss the complaint against state defendants, and strike paragraphs 2, 4, 8 and 11 from the district court's December 14, 2005 judgment.

31

STRAUB, Circuit Judge, concurring in part and dissenting in part:

When the State of New York accepted federal funding under the Food Stamp Act, 7 U.S.C. §§ 2011-2036, and the Medicaid Act, 42 U.S.C. §§ 1396-1396v, it made a promise to provide residents who cannot afford to pay for food or healthcare with the means to secure these basic necessities of life. Although that promise was technically made to the federal government, it can be enforced to some extent by qualified beneficiaries, upon whom the Acts "unambiguously confer[] [the] right" to receive food stamps and Medicaid assistance in a timely manner. *See Gonzaga Univ. v. Doe*, 536 U.S. 273, 283 (2002) (requiring such a right to support a cause of action under 42 U.S.C. § 1983). Plaintiffs were deprived of that right and thus brought this class action under 42 U.S.C. § 1983 against several governmental agencies that design and implement these programs in New York. In doing so, plaintiffs allege that the policies and practices of the New York City Human Resources Administration ("HRA"), the New York State Office of Temporary and Disability Assistance ("OTDA"), and the New York State Department of Health ("DOH") have the effect of preventing needy New York City families and individuals from applying for, and timely receiving, the benefits to which they are entitled. Following a bench trial in April 2001, the United States District Court for the Southern District of New York (William H. Pauley, III, *Judge*) granted the plaintiff class declaratory and injunctive relief as against all defendants. *See Reynolds v. Giuliani*, No. 98 Civ. 8877 (WHP), 2005 WL 3428213 (S.D.N.Y. Dec. 14, 2005). Only the commissioners of the two state agencies ("State defendants") have maintained their appeal.

Because New York has delegated the day-to-day administration of the food stamp and Medicaid programs to local agencies such as the HRA, *see* N.Y. Soc. Serv. Law, art. 3, the OTDA and DOH did not directly participate in the mishandling of plaintiffs' applications. Furthermore, plaintiffs have not shown that the State defendants promulgated policies or took other affirmative actions that compelled the HRA to wrongfully withhold benefits. Plaintiffs' §

1

1983 complaint against the State defendants is best construed as a claim, not of malfeasance, but of nonfeasance – or, more precisely, a failure to adequately train and supervise.

I concur with my colleagues that a governmental entity's failure to properly train or supervise may serve as the basis for § 1983 liability only where that failure reflects a deliberate indifference to the rights of citizens and is closely related to the ultimate injury suffered. *See City of Canton v. Harris*, 489 U.S. 378, 388, 391 (1989). To permit claims based upon a failure to act "to go forward under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability," *id.* at 392 – a result that the Supreme Court has specifically rejected, *see Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 693-94 (1978). Moreover, such a result would abrogate the language of § 1983, which makes clear that only a person who, under color of law, "*subjects, or causes to be subjected*, any citizen . . . to the deprivation of any rights . . . shall be liable to the party injured," 42 U.S.C. § 1983 (emphasis added); *see Duchesne v. Sugarman*, 566 F.2d 817, 830 (2d Cir. 1977) ("The doctrine of respondeat superior is unavailable as a basis for imposing liability under § 1983; there must be some showing of personal responsibility."). The District Court thus erred when it held the State defendants liable under § 1983 without first determining that their failure to adequately train and supervise amounted to deliberate indifference, and that such failure caused plaintiffs' injury.

While I agree that the District Court's judgment against the State defendants was premised on legal error, I believe that this error warrants vacatur and remand instead of reversal. As the Supreme Court has instructed, "[w]hen an appellate court discerns that a district court has failed to make a finding because of an erroneous view of the law, the usual rule is that there should be a remand for further proceedings to permit the trial court to make the missing findings." *Pullman-Standard v. Swint*, 456 U.S. 273, 291 (1982). The only exception to this rule is when "the record permits only one resolution of the factual issue." *Id.* at 292. This exception should be construed narrowly, since "factfinding is the basic responsibility of district courts, rather than appellate courts." *DeMarco v. United States*, 415 U.S. 449, 450 n.1 (1974).

Deliberate indifference and causation are fact-sensitive issues. Furthermore, the facts in this case are extensive and complex, filling thousands of pages of dense reports, declarations, and deposition testimony. My colleagues, perhaps swayed by a sense that this litigation has gone on long enough, have concluded that this case need not drag on longer because the record permits only one conclusion – that whatever their shortcomings, the State defendants were not deliberately indifferent to plaintiffs' rights and did not cause plaintiffs' injury. Because I do not view the record as so clear-cut and one-sided, I would follow the usual rule and remand for further proceedings. I therefore dissent in the result.

## I.

I shall begin with the fault element of plaintiffs' § 1983 claim. In *Canton*, the Supreme Court explained that a governmental entity's "failure to provide proper training may fairly be said to represent a policy for which [it] is responsible," where "in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of . . . [citizens'] rights, that the policymakers . . . can reasonably be said to have been deliberately indifferent to the need." 489 U.S. at 390.

We have previously distilled *Canton*'s explanation of deliberate indifference into three concrete requirements, which apply to inadequate training and inadequate supervision claims alike. *See Walker v. City of New York*, 974 F.2d 293, 297 (2d Cir. 1992), *cert. denied*, 507 U.S. 961, 972 (1993). "First, the plaintiff must show that a policymaker knows 'to a moral certainty' that her employees will confront a given situation.'" *Id.* (quoting *Canton*, 489 U.S. at 390 n.10). "Second, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation." *Id.* "Finally, the plaintiff must show that the wrong choice by the . . . employee will frequently cause the deprivation of a citizen's . . . rights." *Id.* at 298.

Citing this Court's decision in *Doe v. New York City Dep't of Social Servs.*, 649 F.2d 134 (2d Cir. 1981), *cert. denied*, 464 U.S. 864 (1983), the State defendants argue that the *Walker* requirements should be applied more strictly in this case because their power over the local agencies "is far less than the degree of control typically found in supervisor-subordinate relationships within a single agency or institution." In particular, the State defendants point out that under the scheme established by the New York Social Services Law, they lack the authority to dictate the size or composition of any local agency's staff.

In *Doe*, the plaintiff claimed to have suffered continuous abuse at the hands of her foster father and brought a § 1983 action against the agency charged with supervising her foster care. 649 F.2d at 136-37. The plaintiff asserted that "the agency's failure to supervise her placement adequately and to report her situation to the New York City Department of Social Services as a suspected case of child abuse led to the continuation of her mistreatment in the home." 649 F.2d at 137. In analyzing deliberate indifference in that context, we observed that the foster care agency's relationship to the families it licensed differed in two key respects from the normal supervisor-subordinate relationship within a single institution. *Id.* at 142. First, unlike institutional administrators, who "can readily call in subordinates for consultation" and "give strict orders with reasonable assurance that their mandates will be followed," the foster care agency "had to rely upon occasional visits for its information gathering, and its relationship to the foster family was less unequivocally hierarchical." *Id.* Second, "given its goal of approximating a normal family environment for foster children," the foster care agency understandably "felt constrained to respect the foster family's autonomy and integrity and pressured to minimize intrusiveness." *Id.* As the State defendants here emphasize, we noted that these differences tended to "suggest that deliberate indifference ought not to be inferred from a failure to act as readily as might be done in the [normal institutional] context, since in the foster care situation, there are obvious alternative explanations for a family being given the benefit of the doubt and the agency refusing to intervene." *Id.*

4

Our analysis did not end there, however. We went on to recognize that "[i]n other cases, defendants have been 'charged with knowledge' of unconstitutional conditions when they persistently violated a statutory duty to inquire about such conditions and to be responsible for them." *Id.* at 145 (citing *United States ex rel. Larkins v. Oswald*, 510 F.2d 583 (2d Cir. 1975); *Wright v. McMann*, 460 F.2d 126 (2d Cir. 1972), *cert. denied*, 409 U.S. 885 (1972)). We explained that "[t]hese cases are best understood not as imposing strict liability under section 1983 for failure to perform statutory duties, but as inferring deliberate unconcern for plaintiffs' welfare from a pattern of omissions revealing deliberate inattention to specific duties imposed for the purpose of safeguarding plaintiffs from abuse." *Id.*; *see also Duchesne*, 566 F.2d at 832 n.31. The foster care agency had "a strict duty," imposed on it by state law, "to report all suspected cases of child abuse to the Department of Social Services." *Doe*, 649 F.2d at 145. We determined that if the agency persistently failed to carry out that statutory duty, it could be held liable under § 1983, notwithstanding its imperfect knowledge of the situation and limited control over the foster family. *See id.* at 146.

A state is free not to participate in the "scheme of cooperative federalism" established under the Food Stamp and Medicaid Acts, but if it decides to join, "it must comply with federal requirements if it is to assure the continued availability to it of federal funds to defray a part of the total expense of assisting its needy citizens." *Rothstein v. Wyman*, 467 F.2d 226, 232 (2d Cir. 1972), *cert. denied*, 411 U.S. 921 (1973) (internal quotation marks omitted). The Acts impose a number of specific, binding obligations on participating states for the benefit of applicants. For instance, the Food Stamp Act provides that each state, *inter alia*:

(1) "shall provide timely, accurate, and fair service to applicants for, and participants in, the food stamp program," 7 U.S.C. § 2020(e)(2)(B)(i);
(2) "shall permit an applicant household to apply to participate in the program on the same day that the household first contacts a food stamp office in person during office hours," *id.* § 2020(e)(2)(B)(iii);
(3) "shall consider an application that contains the name, address, and signature of the applicant to be filed on the date the applicant submits the application," *id.* § 2020(e)(2)(B)(iv);

5

(4) "shall thereafter promptly determine the eligibility of each applicant household by way of verification of income . . . so as to complete certification of and provide an allotment retroactive to the period of application to any eligible household not later than thirty days following its filing of an application," *id.* § 2020(e)(3); and

(5) "shall . . . provide coupons no later than 7 days after the date of application to any household which [qualifies for expedited food stamp service]," *id.* § 2020(e)(9)(A).

The Medicaid Act similarly mandates that a state's plan for medical assistance "provide that all individuals wishing to make application for medical assistance under the plan shall have opportunity to do so, and that such assistance shall be furnished with reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8).

Both Acts permit a participating state to delegate the administration of the assistance programs to local agencies. *See* 7 U.S.C. § 2012(n)(1) (Food Stamp Act); 42 U.S.C. § 1396a(a)(1) (Medicaid Act). However, "[a] state that chooses to operate its program[s] through local, semi-autonomous social service agencies cannot thereby diminish the obligation to which the state, as a state, has committed itself, namely, compliance with federal requirements governing the provision of the . . . benefits that are funded by the federal government." *Robertson v. Jackson*, 972 F.2d 529, 534 (4th Cir. 1992), *cited in Henrietta D. v. Bloomberg*, 331 F.3d 261, 286-87 (2d Cir. 2003), *cert. denied*, 541 U.S. 936 (2004).[1] In other words, although

_____

[1] In *Henrietta D.*, we considered the scope of a state agency's liability under another Spending Clause legislation – the Rehabilitation Act of 1973, 29 U.S.C. § 794, et seq. Observing that "Spending Clause legislation is 'much in the nature of a contract,'" we looked to general principles of contract law to determine the proper remedy. 331 F.3d at 285 (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). Applying these principles, we determined that the State of New York – like any obligor that promises performance in exchange for consideration – was "liable to guarantee that those it [had] delegate[d] to carry out its programs satisf[ied] the terms of its promised performance, including compliance with the Rehabilitation Act." *Id.* at 286. We also noted that "[a] number of non-Second Circuit cases . . . seem to take the view that the state's assumption of liability under [other Spending Clause legislation such as] the Food Stamp and Medicaid Acts renders it liable for violations of those acts by local agencies." *Id.* (citing, *inter alia*, *Robertson*, 972 F.2d at 534). Consistent with those cases, we held that the Commissioner of the New York State Department of Social Services was subject to supervisory liability for localities' non-compliance with the Rehabilitation Act. *Id.* at 287. We declined to decide "what factual showing would adequately establish an actionable failure to supervise," however, as the issue was not squarely presented. *Id.*

Here, plaintiffs chose 42 U.S.C. § 1983 as the statutory vehicle to enforce their rights to

6

administrative duties may be passed down, "ultimate responsibility for compliance with federal requirements nevertheless remains at the state level." *Robertson*, 972 F.2d at 533 (internal quotation marks omitted).

To discharge this ultimate responsibility, a state that chooses to delegate administrative duties to local agencies must, at the very least, provide those agencies with adequate guidance on the proper procedures for determining eligibility so that qualified applicants receive the assistance they need in a timely manner. *See* 7 U.S.C. § 2020(e)(2)(A) ("[T]he State agency shall establish procedures governing the operation of food stamp offices that the State agency determines best serve households in the State . . . ."); 7 C.F.R. § 272.3(a) ("State agencies shall prepare and provide to staff responsible for administering the Program written operating procedures."); *see also* 42 U.S.C. § 1396a(a)(4)(B) (specifying that the state plan for medical assistance must provide "for the training and effective use of paid subprofessional staff . . . in the administration of the plan").[2]

In addition, the state must conduct regular reviews of the local agencies to ensure that the correct procedures are being followed and that the rights of eligible beneficiaries are not being violated. *See* 7 C.F.R. § 275.5 (requiring the state agency in charge of the food stamp program to conduct Management Evaluation reviews "to measure compliance with the provisions" of Food and Nutrition Service regulations); *see also* 42 C.F.R. § 435.903(a) (mandating that the state agency charged with overseeing the Medicaid program "[h]ave methods to keep itself currently informed of the adherence of local agencies to the State plan provisions and the agency's

---

food stamps and Medicaid assistance. Therefore, we need not decide whether a cause of action exists against the State defendants directly under the Food Stamp and Medicaid Acts, or what standard of fault, if any, would apply to such a hypothetical claim. Section 1983, which sounds in tort rather than contract, *see City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 709-10 (1999), demands some showing of fault, and where the claim alleges a failure to train or supervise, the requisite standard is deliberate indifference. *See Canton*, 489 U.S. at 388.

[2] HRA submits its proposed local procedures, relating to policy matters as well as operational issues such as computer support, to the DOH for review and sign-off. The OTDA likewise has the authority to disapprove of local rules and procedures.

7

procedures for determining eligibility"). If deficiencies are discovered, the state must promptly formulate a corrective action plan to address them, and then undertake follow-up measures to ensure that the plan is fully implemented and the identified deficiencies cured. *See* 7 C.F.R. § 275.16(c) (providing that the state agency in charge of the food stamp program "shall ensure that appropriate corrective action is taken on all deficiencies including each case found to be in error by quality control reviews and those deficiencies requiring corrective action only at the project area level"); *id.* § 275.18(b) (stating that "[p]roject area/management unit corrective action plans shall contain all the information necessary to enable the State agency to monitor and evaluate the corrective action properly"); *id.* § 275.19(b) (directing the state agency to "ensure that corrective action on all deficiencies identified in the State Corrective Action Plan and Project Area/Management Unit Corrective Action Plan is implemented and achieves the anticipated results within the specified time frames"); *see also* 42 C.F.R. § 435.903(b) (requiring that the state agency responsible for the Medicaid program "[t]ake corrective action to ensure [the local agencies'] adherence [to the state plan provisions and the agency's procedures for determining eligibility]").

As detailed in the following sections, there is evidence in this record indicating that, despite a long history and alarmingly high rate of HRA staff mishandling food stamp and Medicaid applications following the implementation of the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA"), Pub. L. 104-193, 110 Stat. 2105 (1996), the State defendants continually failed to provide the training and supervision needed to remedy systemic problems. To point to two examples in particular, the record contains evidence that the State defendants: (A) failed to provide adequate guidance regarding the proper method of processing applications, so as to ensure that applicants' eligibility for food stamps and Medicaid benefits was determined separately from their eligibility for cash assistance; and (B) failed to adequately review the local agencies and monitor the success of corrective action plans. Although the State defendants cannot be held liable under § 1983 merely for not living up to its statutory

8

obligations, *Doe* teaches that evidence of a pattern of inattention to statutory duties can support an inference of deliberate indifference. 649 F.3d at 145-46. I would therefore remand to allow the fact finder to decide whether that inference should be drawn here.

**A.**

As the District Court aptly described it, PRWORA "represent[ed] a legislative sea change in thinking about welfare." *Reynolds v. Giuliani*, 35 F. Supp. 2d 331, 347 (S.D.N.Y. 1999). Among other things, PRWORA eliminated the Aid to Families with Dependent Children program and replaced it with a new cash assistance program called Temporary Assistance to Needy Families ("TANF"). A central purpose of TANF, as articulated in the statute itself, is to "end the dependence of needy parents on government benefits by promoting job preparation, work, and marriage." 42 U.S.C. § 601(a)(2). Consistent with that purpose, PRWORA provides that a participating state must "[r]equire a parent or caretaker receiving assistance under the program to engage in work (as defined by the State) once the State determines the parent or caretaker is ready to engage in work, or once the parent or caretaker has received assistance under the program for 24 months (whether or not consecutive), whichever is earlier . . . ." 42 U.S.C. § 602(a)(1)(A)(ii); *see also id.* § 607 (describing mandatory work requirements).

In response to the PRWORA, HRA began converting its "Income Support Centers" into new "Job Centers" in March of 1998. The conversion encompassed much more than switching the sign above the buildings; it entailed a complete overhaul of the application and eligibility determination procedures. Prior to PRWORA, any individual seeking public assistance was provided with a state-approved joint application form for food stamps, Medicaid, and cash assistance. Once the individual completed the application, the application specialist registered the applicant and scheduled an appointment for a full application interview for five to seven days later, or in emergency need cases, for that same day. *See Reynolds*, 35 F. Supp. 2d at 335. After PRWORA, the state must first determine that the individual seeking cash assistance is exempt from work activities or ready to engage in work. If the individual is ready to work, then he or she

9

must immediately be assigned job search activities and placed on the path towards gainful employment. *See id.* at 335-36. These new requirements apply only to cash assistance and do not affect the eligibility standards or statutorily-prescribed time frames for providing food stamps or Medicaid. Hence, as a result of PRWORA, cash assistance had to be delinked from food stamps and Medicaid.

The Welfare Management System ("WMS") is a code-driven computer system used to process and track applications at the local centers. Before PRWORA, when an individual applied for cash assistance, WMS automatically enrolled the applicant for a food stamp and/or Medicaid eligibility determination. In an effort to implement PRWORA, the system was changed to require a cash assistance worker to affirmatively input a code into WMS to indicate when an individual is also applying for food stamps or Medicaid, thereby signaling the need for a separate determination. If the cash assistance worker uses the incorrect code and cash assistance is later denied, the application is never reviewed for food stamp and Medicaid eligibility, and it is impossible to detect this error through WMS. Furthermore, even if the cash assistance worker uses the correct code, the denial of cash assistance requires that the entire application be closed in WMS. For a separate determination on food stamp and Medicaid eligibility to be made, the cash assistance worker must make a copy of the application and forward it to the food stamp or Medicaid specialist, who is most likely located in a different office. The specialist must then reenter the information and re-register the application using the original filing date.

In January 1999, the District Court found that the staff at the new Job Centers were denying applicants food stamps and Medicaid benefits for failing to comply with PRWORA's work rules. *See id.* at 346. The District Court preliminarily enjoined the HRA from converting any more Income Support Centers into Job Centers pending approval of an adequate corrective plan, which was to include, *inter alia*, "[p]rocedures for processing applications for food stamps and/or Medicaid where applicants fail to comply with work requirements." *Id.* at 348.

10

Although a corrective action plan was approved in May 1999, *see Reynolds v. Giuliani*, 43 F. Supp. 2d 492 (S.D.N.Y. 1999), a November 1999 review by the United States Department of Agriculture ("USDA") confirmed that there was still a "serious program deficiency" relating to separate determinations. The HRA's program evaluation of Job Centers and Income Support Centers for the period November 1999 to June 2000 revealed that 96% of cases requiring a separate determination for food stamps were not prepared for transfer to the food stamp office, and that 86% of cases requiring a separate determination for Medicaid did not have a copy of the correct referral form. An audit performed in September 2000 showed that the Job Centers were making separate food stamp and Medicaid determinations "only about 14 percent of the time." *Reynolds*, 2005 WL 342106, at *20.

Against this backdrop, a fact finder could conclude that the State defendants knew to a "moral certainty" that HRA employees were often entering the wrong code and not referring applications for separate determinations – choices that frequently resulted in the deprivation of beneficiaries' rights. *See Walker*, 974 F.2d at 297-98. Despite the urgency of this problem, it appears that as of 2001, when the trial in this case was held, no effort had been made to remedy these problematic aspects of WMS. The February 2001 deposition testimony of Betty Rice, a director within DOH's Office of Medicaid Management, is revealing. When asked whether it was the case that WMS "closes the application [when cash assistance is denied] and that the Medicaid application has to be re-registered with the original filing date," Rice replied: "I am not denying that." When asked whether DOH had a plan to change that feature of WMS, Rice answered: "No, it does not." Later in the deposition, Rice was questioned about how an applicant who has been denied cash assistance for a reason that requires a separate Medicaid determination can tell whether the necessary referral has been made. Rice responded: "[I]f a person is supposed to have a separate determination, they would be notified on their notice that they are to have a separate determination, and a prudent person I think could determine if in a reasonable amount of time they didn't get a determination about the separate determination that

11

maybe something was wrong and they should look into that." When pressed about what would happen if an applicant were to inquire and discover that the referral had not been made, Rice stated that "one would expect that [the Medicaid application] would go back to the date that the case should have been referred for the separate determination." However, Rice also admitted that DOH's instructions "may be silent on the issue."

As Judge Cardamone points out, the State defendants did take some measures after the initiation of this lawsuit to foster compliance by the HRA. *See Reynolds*, 2005 WL 342106, at *21. As I read *Canton*, however, the operative question is not whether the State defendants provided *any* training at all, but whether the State defendants ignored an obvious "need for *more or different* training" in light of the duties assigned to the HRA. 489 U.S. at 390 (emphasis added). In my view, a reasonable fact finder could conclude, based upon the above evidence, that the State defendants failed to respond to such a need for more training and corrective action relating to separate determinations, despite their knowledge that the inadequacy would continue to result in violations of beneficiaries' rights. This evidence counsels remand.

**B.**

The record also contains evidence indicating that the State defendants "persistently violated [their] statutory duty to inquire about . . . conditions" at the new Job Centers "and to be responsible for them." *Doe*, 649 F.2d at 145. Given the significance of PRWORA's reforms, one might have expected the State defendants to step up their supervision efforts to ensure that the implementation of those reforms did not affect eligible beneficiaries' access to food stamps and Medicaid. In its November 1998 review, the USDA discovered exactly the opposite situation – a "lack of effective state agency oversight over the local district offices." *Reynolds*, 2005 WL 342106, at *12. The USDA found that due to the OTDA's inadequate supervision, "[s]ubstantial non-compliance with the [Food Stamp Act] and regulations had gone undetected and unaddressed at the local level." *Id.* As for the DOH, it acknowledged before the District Court that it did not even know about the HRA's intention to convert the Income Support

12

Centers into Job Centers until early 1998, and did not learn of the complaints regarding the inappropriate denials, withdrawals, and deterrence of Medicaid applications until plaintiffs filed this lawsuit in December 1998. *See id.* at \*14. As Betty Rice put it: "[T]he first we understood that there was a problem were [sic] when things came to light in the newspaper articles."

As noted, in January 1999 the District Court preliminarily enjoined the HRA from further converting its Income Support Centers into Job Centers, finding that the HRA's administration of the food stamp and Medicaid programs at the Job Centers did not comport with legal standards. Two years later, however, the DOH still had not conducted any on-site reviews of the Job Centers in New York City. The preliminary injunction did prompt the OTDA to conduct reviews of the Job Centers in 2000 and 2001. But as the District Court pointed out in its post-trial order, "reviews were not conducted at regular intervals, and OTDA has no policy regarding how much time may elapse between those reviews." *Id*. at \*12. Rosella Bryson, a senior OTDA official, was questioned about the agency's schedule for future reviews during her February 2001 deposition. She speculated that "with the current schedule we have," it would take about three years to complete a round of Management Evaluation reviews – *i.e.*, that each site would receive a review about once every three years.

Perhaps more important than conducting regular reviews is following up on reviews to make sure that problems are corrected. There is evidence to suggest that even when the reviews uncovered serious deficiencies, the OTDA made little effort to ensure that corrective action plans were properly implemented. For example, Bryson recounted that during a review of the Waverly Job Center, the OTDA found that personnel were not having discussions with applicants about food stamp eligibility after cash assistance applications were withdrawn. Despite the severity of the problem, the OTDA did not investigate or evaluate the center's implementation of a corrective action plan for more than a year afterwards. Bryson also acknowledged that the OTDA does not provide written instructions to its staff on how to conduct a corrective action plan review, nor do supervisors discuss any particular center with staff prior to the review. Only

13

one OTDA staff member is assigned to a center, and each visit lasts one and a half days. In that short time, the OTDA staff member reviews just five cases and speaks only to the center director. And although the OTDA makes findings based on the corrective action plan review, the HRA is not required to take any action in response to those findings.

I believe that the above evidence could "constitute[] incremental documentation of a pervasive pattern of indifference" on the part of the State defendants. *Doe*, 649 F.2d at 146. I would remand to allow the District Court to decide whether it does.

## II.

Demonstrating that a governmental entity was deliberately indifferent to citizens' rights is not enough to hold it liable under § 1983; the plaintiffs "must still prove that the deficiency in training [or supervision] actually caused" their injury. *Canton*, 489 U.S. at 391. In other words, the plaintiffs must "prove that the deprivation occurred as a result of a [governmental] policy rather than as a result of isolated misconduct by a single actor." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 130 (2d Cir. 2004).

The District Court found that the Job Centers were, *inter alia*: (A) improperly denying applicants expedited food stamps about 57.33 to 67 percent of the time, *Reynolds*, 2005 WL 342106, at *7; (B) making separate food stamp determinations when denying cash assistance applications only sporadically, and making separate Medicaid determinations less than 11 percent of the time, *id.* at *8; and (C) causing applicants to withdraw applications based on misleading information, which accounted for 45 percent of food stamp application withdrawals and 56 percent of Medicaid withdrawals, *id.* These statistics suggest that the programs' deficiencies resulted from more than the actions of a few rogue employees. Instead such problems arguably implicate the very policies and practices of the HRA, which the State defendants are responsible for overseeing and correcting.

14

As *Canton* instructs, the proper inquiry in addressing the causation issue is as follows: Would plaintiffs' injury have been avoided if the HRA had been trained or supervised under a program that was not deficient in the respects identified above? 489 U.S. at 391. "Predicting how a hypothetically well-trained [and well-supervised] officer would have acted under the circumstances may not be an easy task," but it is one that the "judge and jury, doing their respective jobs, will be adequate to" address. *Id.* In my view, there is sufficient evidence to present a triable issue on causation. I would therefore let the question go to the District Court, which is intimately familiar with the facts in this case and is more than adequate to the task.

### III.

In closing, I reiterate that my aim has not been to show that the State defendants must, or should, be held liable under § 1983, but merely to demonstrate that the record does not foreclose a possible finding of liability by the District Court under the correct legal standards. Granted, six years have passed since the trial, so the existing record may be too stale to support the reentry of a permanent injunction. But whether new evidence should be received is a matter for the District Court to decide, as are the factual issues of deliberate indifference and causation. Because I believe that the record permits more than one resolution of these issues, I would remand.

*Reynolds v. Giulani*, No. 06-0283-cv

WALLACE, Circuit Judge, concurring in the judgment:

As Judge Cardamone correctly points out in his opinion, *Monell v. Department of Social Services* bars indirect liability section 1983 claims against state officials. 436 U.S. 658, 691 (1978); *see also Poe v. Leonard*, 282 F.3d 123, 140 (2d Cir. 2002) ("A supervisor may not be held liable under section 1983 merely because his subordinate committed a constitutional tort"). I agree with Judge Cardamone that the district court erred by awarding a judgment in the appellees' favor on these claims, and reversal is required.

I recognize along with Judge Cardamone and Judge Straub that, apart from the bar on respondeat superior liability under section 1983, this court has held that "a supervisor may be found liable for his deliberate indifference to the rights of others." *Poe*, 282 F.3d at 140. The analysis of Judge Cardamone persuades me, but that issue is not properly before us and we need not pursue it. First, the appellees failed to allege either in their complaint or in the pretrial order that the State appellants acted with deliberate indifference or gross negligence. Second, the district court never made findings to this end. Third, until prompted to do so, the appellees did not address these issues and even tried to distinguish *City of Canton v. Harris*, 489 U.S. 378 (1998), the case on which the deliberate indifference analysis depends. Finally, the deliberate indifference approach fails to provide a coherent account of the district court's disposition of the various claims in the complaint. It strikes me that we cannot review a case on appeal that

1

was not tried in the district court, and I would not now permit appellees to correct on appeal strategic mistakes that they made in the trial court; the issue is forfeited and *Monell* ends the game. Under these circumstances, I conclude there is no reason to remand and allow appellees to start over with a new game plan.