Wilma **STEVENS**, et al., Plaintiffs,

v.

**CITY OF BRIDGEPORT,**
**et al., Defendants.**

**Civil Action No. 07–cv–0771 (JCH).**

United States District Court,
D. Connecticut.

April 14, 2009.

Michelle N. Holmes, Law Office of Michelle N. Holmes, Waterbury, CT, for Plaintiffs.

John Richard Mitola, City of Bridgeport, Bridgeport, CT, Jonathan J. Einhorn, New Haven, CT, for Defendants.

## RULING RE: DEFENDANT CITY OF BRIDGEPORT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 56)

JANET C. HALL, District Judge.

Plaintiffs Wilma Stevens, Joette Devan, and Nancy O'Donnell bring this action against defendants City of Bridgeport and Pablo Otero. In Counts One, Three, and Four, plaintiffs bring constitutional and state law tort claims against defendant Otero. In Count Two, plaintiffs bring a claim against defendant City of Bridgeport ("City"), styled as a claim under 42 U.S.C. § 1983 for failure to train and supervise employees resulting in an infringement of the plaintiffs' constitutional rights. Pending before the court is defendant City's Motion for Summary Judgment on Count Two.[1] For the reasons that follow, defendant City of Bridgeport's Motion (Doc. No. 56) is granted in part and denied in part.

## I. FACTUAL BACKGROUND[2]

### A. *Otero's History and Behavior*

Defendant Pablo Otero began working for the City as a patrol officer in 1983. Ex. 9 at 7–8. He was promoted to detective in 1989 and to sergeant in 1993. Ex. A at 7–8. He remains a sergeant and is currently on the promotion list for Lieutenant. Ex. 9 at 8–11.

In the 1990s, Otero was accused of posting an inappropriate picture of a female on a locker or bulletin board. Ex. 11; Ex. 9 at 44–46. He initially received a one-day suspension as discipline, but the discipline was "taken back" by the chief and not imposed. Ex. 9 at 44–46. In 1998, a female co-worker accused Otero of sexually harassing her. Ex. LL. She alleged that he had grabbed her hand and placed it on the outside of his pants next to his genitalia. Ex. LL at 3. He made a reference to her feeling and tasting his "chocolate," and then started to unzip his pants. *Id.* The City conducted an investigation and sustained the complaint. Ex. JJ; Ex. KK; Ex. LL. Following hearings, the Board of Police Commissioners imposed a 60 day suspension on Otero, made him ineligible for promotion for one year, and required him to undergo additional sexual harassment training. Ex. LL at 30. Otero appealed the imposed discipline, and an arbitrator reduced the discipline to the loss of 17 holidays. Ex. MM at 60. On October 17, 2003, Sergeant Giselle Dosypoj filed a complaint alleging that Otero had engaged in "unprofessional" and "intimidating" conduct. Ex. 9 at 50–51; Ex. 13. This conduct may have involved sexual harassment. Ex. 9 at 51; Ex. 13; Ex. 20 at 3.

Prior to the formal written complaint that initiated the Office of Internal Affairs investigation in this case, a number of Otero's coworkers and supervisees in the detective bureau, besides the plaintiffs, were aware that he engaged in sexually harassing behavior in the workplace. Ex.

---

1. Counts One, Three, and Four are not at issue in this decision.

2. For the purposes of the instant Motion, the court accepts facts undisputed by the parties and supported by evidence as true, and resolves disputed facts in favor of the nonmoving parties where there is evidence to support their allegations.

3 at 27; Ex. 4 at 16–20, 28–30, 35; Ex. 20; Ex. 21; Ex. 22.

## B. *Sexual Harassment Policies and Training*

The City of Bridgeport implemented a sexual harassment policy, which applied to all city departments including the police department, by 1992. Ex. 2. In January of 1999, it amended this policy. Ex. 2; Ex. O. On March 18, 2004, the Bridgeport Police Department promulgated its own sexual harassment policy. Ex. Q. This policy is part of the Departmental Policy and Procedure Manual that all officers have and with which all officers are required to be familiar. Ex. F.

None of the three plaintiffs has received sexual harassment training at her workplace. Ex. 3 at 41–42; Ex. 4 at 49–50; Ex. 5 at 78–79. At some point prior to the events of this case, each plaintiff was handed a sexual harassment policy and was told to review it on her own and sign a document stating that she received it. Ex. 3 at 41–42; Ex. 4 at 49–50; Ex. 5 at 78–79. O'Donnell did not fully understand the policy when she received it, but was aware of the existence of the policy and of her right to file a complaint. Ex. 3 at 41–42. Stevens was first given a copy of the policy in 2002 or 2003. Ex. 5 at 78–81. The record does not reflect when Devan first became aware of the sexual harassment policy. *See* Ex. 4 at 49–50. Plaintiffs have not seen postings within their place of employment regarding sexual harassment. Ex. 4 at 49; Ex. 5 at 79–81; Ex. 6 at ¶ 5.

At least two incidents of sexual harassment not involving Otero were the subject of departmental discipline prior to the events at issue in this case. Ex. 23 at 5–6. Each of these were one-time incidents, and each involved a single complainant. *Id.* In one incident, a sergeant stated to a female dispatcher, "Are your inner thighs moist and wet? and made fake heavy breathing noises." *Id.* He received discipline in the form of a loss of fifteen holidays. *Id.* In a second incident, a sergeant remarked to a female detective that "she 'should be giving [Deputy Chief] a blowjob for all the overtime she's getting." *Id.* He received discipline in the form of a loss of two holidays. *Id.* Both sergeants have since been promoted to lieutenant. *Id.*

Otero first became aware of the City's sexual harassment policy in the late 1980s or early 1990s. Ex. 9 at 13. He received a copy of the policy during "roll call" but was not trained on the policy. Ex. 9 at 13. Captain Robert Gearing similarly became aware of the City's sexual harassment policy in the late 1980s or early 1990s. Ex. 28 at 13–14. He also received a copy of the policy during "roll call" but was not trained on the policy. *Id.* Otero first received sexual harassment training on February 11, 1999, for three hours. Ex. 9 at 21; Ex. DD; Ex. EE at 50. He received training again on June 9, 2000, for three hours. Ex. DD; Ex. EE at 50, 87. He was sent for retraining because, according to the instructor, he had been a "bad boy." EE at 87–88. He received additional training on April 1, 2004, and June 26, 2006. Ex. DD.

Charlene Hosticka provided sexual harassment training to Department employees in 1999 and 2000, including the training received by Otero. Ex. DD; Ex. EE at 87–88. Training records show that Hosticka provided training to 12 individuals in 2000, and 39 individuals in 2004. Ex. SS. Hosticka was first hired as the City's Labor Management Coordinator in 1993. Def.'s Rule 56(a)(1) Stmt. at ¶ 60. She previously worked in management and marketing. Ex. EE at 12–13. Hosticka has not been trained in providing sexual harassment training. Ex. EE at 28. She conducted some sexual harassment training at a company where she worked part-

time prior to working for the City. Ex. EE at 68–70. While working for the City, she attended a municipal conference where there was one module specifically on sexual harassment training. Ex. EE at 23–25. She began conducting sexual harassment training for the City around 1995, and for the Police Department in 1999. Ex. EE at 26–27, 47; Ex. SS. Hosticka put together a guide and workbook from internet materials, library sources, and in consultation with the director of the City's Office of Labor Relations, and periodically updated these materials. Ex. EE at 40–41, 45–49, 53, 67. The materials included a 64–page manual and 21–page workbook. Ex. FF; Ex. GG. Hosticka used these materials to conduct three-hour training sessions. Ex. EE at 70.

Captain Robert Gearing provided sexual harassment training beginning in 2004. Otero received training from Gearing on April 1, 2004 and June 26, 2006.[3] Ex. DD. Gearing has not been trained in providing sexual harassment training. Ex. 28 at 10.

At the time of the events of this case, Lieutenant James Viadero, the number two supervisor in the detective bureau, was aware of the Department and City policies prohibiting sexual harassment in the workplace and that complaints or conduct in violation or potential violation of those policies needed to be immediately addressed. Ex. F at ¶¶ 3, 9, 18, 19.

### C. Otero's Harassment of Plaintiffs

Plaintiff Joette Devan, a Bridgeport Police Officer, was promoted to detective in June 2002. In January 2004, Devan complained to her supervisor, Detective Vin Verillo, that Otero was harassing her. Ex. 14 at 2–4. Devan asked Verillo to not act on her complaint. Ex. 14 at 3; Ex. C at 22–23. Verillo witnessed Otero's conduct. Ex. 14 at 3. Verillo reported Otero's conduct to Lieutenant James Viadero, the number two supervisor in the detective bureau. Ex. 14 at 3; Ex. C at 23–24. The complaint was not formally investigated at that time. Viadero told Verillo that if Devan wanted to make a complaint, she should put it in writing. Ex. 14 at 3. Viadero advised Verillo that otherwise, Devan should speak with Otero directly and "dress [him] down." Ex. 14 at 3. Verillo informed Otero of Devan's complaint and instructed him to stop his behavior. Ex. 14 at 3; Ex. 9 at 58. Otero's behavior did not stop, and Verilllo was aware that Otero's behavior did not stop. Ex. 14 at 3; Ex. 4 at 26. After Verillo talked to Otero, Otero then asked Devan to come into his office to speak with him, and he instructed her to shut the door. Ex. 4 at 24–26; Ex. 9 at 58. Devan went to his doorway but did not close the door. Ex. 4 at 25–26.

Plaintiff Nancy O'Donnell, now a Bridgeport Police Officer, was a civilian training coordinator in the detective bureau from 2003 to 2007. Ex. B at 7. Otero gave O'Donnell sexually suggestive demeaning looks at various times during a 10–year period prior to the events at issue in this case. Ex. B at 22–24. In March 2004, O'Donnell complained to her supervisor, Viadero, that Otero was harassing her.[4] Ex. 3 at 15–16. O'Donnell explained that Otero was interfering with her job duties, and that he was engaging in unwanted eye contact, inappropriate mannerisms, and body gyrations. Ex. 3 at 15–16. O'Donnell's verbal complaint was not for-

---

3. It appears that Hosticka continued to conduct training as well through May 26, 2004. Ex. SS. Hosticka's position was eliminated in 2004. Ex. EE at 25–26.

4. Viadero acknowledges that he spoke with O'Donnell around this time regarding disputes she had with Otero, but denies that O'Donnell informed him of any behavior that could be perceived as sexual harassment. Ex. F at ¶¶ 5–9.

mally investigated. Viadero spoke with Otero directly about the complaint. Viadero advised Otero to stay away from O'Donnell, explaining, "I don't know about this chick, I don't know if she's nutso, but just stay away from her. Don't even go in the back, don't even look at her."[5] Ex. 15 at 16; Ex. 3 at 16. Otero then spoke with O'Donnell about O'Donnell's complaint. Ex. 3 at 38–39.

Otero continued to harass O'Donnell following her verbal complaint. Ex. 3 at 31. On May 11, 2004, O'Donnell filed a written complaint with Viadero. Ex. 16. Devan and O'Donnell spoke with Viadero that day about Otero's sexually harassing behavior. Ex. F at ¶¶ 12–14. Viadero informed Otero of O'Donnell and Devan's allegations that day. Ex. F at ¶¶ 13–15. He ordered Otero to prepare a report. Ex. F at ¶ 13. He asked O'Donnell and Devan for written reports of their complaints. Ex. F at ¶ 14. He brought Devan and O'Donnell to the office of Captain Lynn Kerwin, commander of the detective bureau, and informed Kerwin of the complaints. Ex. F at ¶ 14. Kerwin and Viadero said that the concerns would be addressed and that Otero would be ordered to have no contact with Devan and O'Donnell. Ex. F at ¶¶ 14–15. O'Donnell provided Viadero with a written report. Ex. F at ¶ 14; Ex. 16. Viadero prepared a report for Kerwin and provided it to her on May 12, 2004. Ex. H; Ex. J at ¶ 5. On May 12, 2004, Viadero told Otero that a formal complaint was filed against him by O'Donnell and that he was to stay away from the area of the detective bureau where O'Donnell's office was located. Ex. F at ¶ 15; Ex. H. Viadero instructed Otero and O'Donnell that any further incidents or confrontations were to be reported to him, and that no retaliatory conduct was to take place. Ex. F at ¶ 15; Ex. H.

Kerwin canvassed O'Donnell and Devan about their experiences and conducted a preliminary investigation. Ex. J at ¶ 4. On June 4, 2004, she turned the information over to the head of the Office of Internal Affairs, Lieutenant John Brenner, for further investigation. Ex. J at ¶ 6; Ex. K. Otero continued to harass Devan following the filing of O'Donnell's written complaint. Ex. 4 at 21–22, 24–26.

Plaintiff Wilma Stevens is a clerk typist in the detective bureau. Ex. D at 5. Prior to O'Donnell making her complaint, Stevens had informed Sergeant Joe Adiletta about some of her difficulties working with Otero, but had not provided him with full details regarding Otero's harassing conduct. Ex. 5 at 35–36. Stevens fully confided in a co-worker, Migdalia Torres, who advised her to report Otero's conduct, but Stevens did not report it. Ex. D at 8–9, 12–15. Stevens feared Otero and feared how she might be viewed within the Department if she complained. Ex. 5 at 14, 37, 50, 57.

Following the earlier verbal complaints and O'Donnell's written complaint of May 11, 2004, Otero continued to harass the plaintiffs. Ex. 3 at 31, 38–39; Ex. 4 at 21–22, 24–26; Ex. 9 at 58. The harassment continued until Otero was transferred out of the detective bureau by Chief Wilbur Chapman on July 22, 2004. Ex. 4 at 21–22; Ex. 17; Ex. J at ¶ 8.

In July 2004, after Otero's removal from the detective bureau, Stevens complained to Adiletta that Otero had harassed her, and informed him of the details of Otero's harassment. Ex. 19 at 10–11. After Stevens informed Sergeant Adiletta of the full details, Adiletta reported this information to Internal Affairs. Ex. 19 at 11. Internal Affairs did not initiate an independent complaint against Otero on behalf of Stevens. At some point, Internal Affairs contacted Stevens's husband, a former

---

5. Viadero denies having made this statement. Ex. F at ¶ 17.

Bridgeport detective, regarding the matter. Ex. 5 at 10.

### D. *Internal Affairs Investigation and Disciplinary Process*

The City conducted an internal affairs investigation concerning Otero's harassment. The complaints of the three plaintiffs were not investigated separately; only O'Donnell's complaint was formally investigated. Ex. N. The investigation was conducted by Sergeant John DeVone. Ex. N.

All three plaintiffs provided detailed statements to the Office of Internal Affairs. Ex. N. DeVone's report and findings sustained O'Donnell's complaint. Ex. N. Pursuant to the Department's disciplinary procedure, Acting Chief Anthony Armeno referred the matter to an independent hearing officer for imposition of discipline. Ex. S; Ex. T; Ex. U at ¶ 5. The Director of Labor Relations, Lawrence Osborne, represented the City before hearing officer Laurie Cain. Ex. U at ¶¶ 4, 6. Hearings took place on May 12, May 17, July 5, and September 6, 2005. Ex. U at ¶ 6; Ex. V. All three plaintiffs provided detailed testimony during the hearing.

The complaint was characterized as the O'Donnell complaint, Ex. U at ¶¶ 4, 7, 18; Ex. N. Evidence about Otero's behavior towards Devan and Stevens was presented at the hearings, and their allegations were investigated and made part of the various reports, but no separate finding was made with regard to them. Ex. U at ¶¶ 4, 7, 18; Ex. W; Ex. N. At the hearing, the City sought discipline including termination of employment, a six month suspension without pay and no further contact or supervision of the plaintiffs, or a three month suspension without pay and demotion from sergeant to patrol officer, and no further contact with the plaintiffs. Ex. U at ¶ 8; Ex. X at ¶ 6.

Cain found sufficient cause to support the charge against Otero with regard to Otero's conduct towards all three plaintiffs. Ex. X at 7; Ex. U at ¶ 9. Cain imposed a 45–day suspension without pay and further sexual harassment training at the discretion of the City. Ex. X at 7; Ex. U at ¶ 9. Otero exercised his right to appeal the discipline to the State of Connecticut Board of Mediation and Arbitration, before which the City had the burden of proof to establish that the imposed discipline was warranted. Ex. U at ¶¶ 10–11. Plaintiff O'Donnell was not willing to voluntarily testify at the arbitration proceeding but would have testified if she had been served with a subpoena. Ex. B at 44–47. Osborne became frustrated with O'Donnell over his perception that she was unwilling to voluntarily testify. *Id.* Osborne wrote Chief Norwood a letter indicating that his efforts over several months to meet with O'Donnell to discuss and prepare for the hearing had been unsuccessful. Ex. AA. Osborne perceived O'Donnell as refusing to cooperate. Ex. AA; Ex. U at ¶¶ 14–18. The City settled the disciplinary matter with the union and Otero, and his discipline was reduced from a 45 day suspension to a 20 day suspension without pay. Ex. 24.

## II. DISCUSSION

### A. *Standard of Review*

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *White v. ABCO Engineering Corp.*, 221 F.3d 293, 300 (2d Cir.2000).

Once the moving party has met its burden, in order to defeat the motion the nonmoving party must "set forth specific

facts showing that there is a genuine issue for trial," *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505, and present such evidence as would allow a factfinder to find in her favor, *Graham v. Long Island R.R.,* 230 F.3d 34, 38 (2d Cir.2000).

When assessing the record, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *Anderson,* 477 U.S. at 255, 106 S.Ct. 2505; *Graham,* 230 F.3d at 38. "This remedy that precludes a trial is properly granted only when no rational finder of fact could find in favor of the non-moving party." *Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 134 (2d Cir. 2000). "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised on the basis of the evidence presented, the question must be left to the factfinder. *Sologub v. City of New York,* 202 F.3d 175, 178 (2d Cir.2000).

### B. *Applicable Law*

The parties' briefs exhibit some confusion about the legal standards applicable to plaintiffs' claims. This confusion is somewhat understandable, as plaintiffs may bring employment discrimination claims against municipal employers pursuant to one or more closely related and intertwined bodies of law—Title VII, section 1981, and section 1983.[6]

The court first addresses a preliminary question: under which body of law have plaintiffs brought their claims? The court construes plaintiffs' Count Two, the only count at issue in this Motion, as alleging an equal protection claim pursuant to section 1983. Plaintiffs characterize Count Two as a claim for " § 1983 Failure to Train and Supervise Employees Resulting

In an Infringement of Plaintiffs' Fourteenth Amendment Rights As to Defendant City of Bridgeport." Am. Compl. at Count Two; *see also* Am. Compl. at I (Preliminary Statement) ("The plaintiffs ... bring this action to redress discrimination against them by the defendants ... pursuant to 42 U.S.C. § 1983 for the deprivation of rights guaranteed to the plaintiffs under the fourteenth amendment to the United States Constitution"); Pls.' Opp'n at 1 (Preliminary Statement) ("Plaintiffs' complaint is brought pursuant to 28[sic] U.S.C. § 1983, alleging that the defendant City ... is liable to the plaintiffs for its failure to train and failure to supervise the defendant Pablo Otero thereby causing them to suffer a deprivation of their constitutional right to be free from discrimination in the workplace."). Section 1983 "is not itself a source of substantive rights," but provides "a method for vindicating federal rights elsewhere conferred," such as a claim for denial of equal protection. *Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004). While the Count Two heading does not make clear that plaintiffs' claim is one for denial of equal protection as opposed to a different substantive right conferred by the Fourteenth Amendment such as due process, the supporting allegations and context of the claim, particularly the references to redressing discrimination, make clear that plaintiffs' claim is one for denial of equal protection pursuant to section 1983. *See* Pls.' Opp'n at 16 (explaining that the constitutional violation was the creation of a hostile work environment); *Patterson,* 375 F.3d at 226 (discussing hostile work environment claim brought pursuant to § 1983 as a claim for denial of equal protection); *Gierlinger v. N.Y. State Police,* 15 F.3d 32, 34 (2d Cir.1994) ("[I]n some circumstances a § 1983 claim may be

---

**6.** As there is nothing to suggest that a section 1981 claim is at issue in this case, the court will confine the remainder of its discussion to the distinctions between Title VII and section 1983 claims.

properly grounded on a violation of the Equal Protection Clause of the Fourteenth Amendment based on sexual harassment in the workplace.") (citation omitted). Finally, while hostile work environment claims may also be brought pursuant to Title VII, plaintiffs' Amended Complaint explicitly characterizes Count Two as a section 1983 claim to vindicate an infringement of Fourteenth Amendment rights, and elsewhere makes repeated references to section 1983; by comparison, the Amended Complaint makes only a single, fleeting reference to Title VII.[7]

The court now turns to the question of what standards apply to plaintiffs' claims. In its Motion for Summary Judgment, defendant City asserts that the Title VII standards apply to plaintiffs' section 1983 claims, pointing to cases that have stated that courts construing section 1983 claims apply Title VII law. *See* Def.'s Mot. at 10–13. Plaintiffs, by contrast, assert that they may prevail by proving their case under either the Title VII or section 1983 legal standards, which they perceive as two distinct bodies of law. *See* Pls.' Opp'n at 15–17, 20–21. Both assertions are partially true, but neither is precisely correct in the context of the instant case.

■ Defendants are correct that "most of the standards applicable to the conduct alleged to constitute hostile work environment in violation of Title VII are also applicable to ... equal protection claims under § 1983." *Patterson*, 375 F.3d at 225. In particular, under either a Title VII or equal protection claim, a plaintiff alleging a hostile work environment must prove that "the workplace was permeated with discriminatory intimidation, ridicule, and insult, that was sufficiently severe or pervasive to alter the conditions of the victim's employment." *Id.* at 227 (citation and internal alterations omitted).

■ Beyond demonstrating a hostile work environment, however, the requirements of the causes of action diverge. First, in states with state anti-discrimination laws and enforcement agencies, such as Connecticut, Title VII claims are subject to a 300–day statute of limitations, *Patterson*, 375 F.3d at 225, while section 1983 ordinarily borrows the state law statute of limitations applicable to personal injury tort claims, which is three years in Connecticut. *See Lounsbury v. Jeffries*, 25 F.3d 131, 134 (2d Cir.1994); *see also City of Rancho Palos Verdes, Cal. v. Abrams*, 544 U.S. 113, 123 n. 5, 125 S.Ct. 1453, 161 L.Ed.2d 316 (2005) (explaining that the statute of limitations for section 1983 claims is generally drawn from the state-law period applicable to personal injury torts, except when the alleged violation rests upon a post–1990 congressional enactment). Second, section 1983 claims may be brought against individual defendants or employers, while Title VII claims are cognizable only against employers. Third, proving a violation of equal protection under section 1983 requires a showing that the discrimination was intentional, while negligence may establish a Title VII claim under certain circumstances.

■ Fourth, and most significant to the court's analysis, the means by which liability attaches to a defendant is different. Under Title VII, a plaintiff may bring a claim for hostile work environment only if a basis exists for imputing the hostile work environment to the employer. In *Burlington Industries, Inc. v. Ellerth*, 524 U.S.

---

**7.** In plaintiffs' jurisdictional statement, plaintiffs make reference to Title VII in addition to section 1983. Am. Compl. ¶ 1 ("This action is brought pursuant to 42 U.S.C. § 1983 and § 2000e *et seq.*"). However, plaintiffs do not make reference to Title VII elsewhere in their complaint, and the court does not construe the boilerplate reference in the Amended Complaint's jurisdictional provision, absent more, as sufficient to allege a Title VII claim.

742, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998), and the companion case of *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998), the Supreme Court set out the standards under which an employer could be held liable for creation of a hostile work environment. In situations where the alleged harasser was the plaintiff's supervisor, courts ask first if the plaintiff was subject to a tangible employment action. If so, the employer is strictly liable. If the plaintiff was not subject to a tangible employment action, the employer is still liable, but subject to an affirmative defense.

In *Ellerth,* the Supreme Court engaged in an extensive discussion of principles of agency law, and made clear that it was drawing upon those principles in determining the question of employer liability. *See Jin v. Metro. Life. Ins. Co.,* 310 F.3d 84, 91–92 (2d Cir.2002) (citing *Ellerth,* 524 U.S. at 754, 118 S.Ct. 2257); *see also Mack v. Otis Elevator Co.,* 326 F.3d 116, 123–25 (2d Cir.2003) (discussing, at length, the principles under which employers may be held vicariously liable for a hostile work environment created by a plaintiff's supervisor). The Court first concluded that in cases where the employee had suffered a tangible employment decision, based upon principles of agency law, the employer would be held strictly liable:

> When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation.... As a general proposition, only a supervisor, or other person acting with the authority of the company, can cause this sort of injury.... Tangible employment actions are the means by which the supervisor brings the official power of the enterprise to bear on subordinates.... For these reasons, a tangible employment action taken by the supervisor becomes for Title VII purposes the act of the employer.

*Ellerth,* 524 U.S. at 761–62, 118 S.Ct. 2257. The court recognized that these same concerns would not necessarily be present in the absence of a tangible employment decision and that, "there are acts of harassment a supervisor might commit which might be the same acts a co-employee would commit, and there may be some circumstances where the supervisor's status makes little difference." *Id.* at 763, 118 S.Ct. 2257. On the other hand, the court recognized that, "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor always is aided by the agency relation." *Id.* Drawing a compromise between these possibilities, and looking beyond the principles of agency law to Title VII's policy of "encourag[ing] the creation of antiharassment policies and effective grievance mechanisms," *id.* at 764, 118 S.Ct. 2257, the Court concluded that it would draw a distinction between cases that did and did not involve tangible employment actions, and make available an affirmative defense in the latter class of cases:

> In order to accommodate the agency principles of vicarious liability for harm caused by misuse of supervisory authority, as well as Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees, we adopt the following holding.... When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages.... The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided

by the employer or to avoid harm otherwise.

*Id.* at 764–65, 118 S.Ct. 2257.

■ Under section 1983, by contrast, liability of a municipal employer cannot be based on a theory of vicarious liability (*respondeat superior*). *Patterson,* 375 F.3d at 226 ("Liability of a municipal defendant ... under ... § 1983 cannot, however, be premised on a theory of *respondeat superior.*"); *Jemmott v. Coughlin,* 85 F.3d 61, 67 (2d Cir.1996); *Gierlinger v. N.Y. State Police,* 15 F.3d 32, 33 (2d Cir. 1994). Therefore, *Ellerth's* detailed analysis of vicarious liability in the context of Title VII actions, and its creation of an affirmative defense through careful balancing of agency principles and Title VII's aims, simply does not apply in the context of Equal Protection claims brought pursuant to section 1983.

■ Under section 1983, to hold a municipality liable, "the plaintiff is required to show that the challenged acts were performed pursuant to a municipal policy or custom." [8] *Patterson,* 375 F.3d at 226 (citations omitted). A plaintiff need not "identify an express rule or regulation." *Id.* (citation omitted). In *Patterson,* the Second Circuit chronicled various theories under which a plaintiff may show that the creation of a hostile work environment was pursuant to a municipal policy or custom, including: (1) a discriminatory practice of municipal officials was so persistent or widespread as to constitute a custom or usage with the force of law; (2) a discriminatory practice of subordinate employees was so manifest as to imply the constructive acquiescence of senior policy-making officials, including the failure to properly investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom or practice of the employer; or (3) the municipality so failed to train its employees as to display deliberate indifference to plaintiffs' constitutional rights. *Id.* Plaintiffs may also bring a claim where a municipality so fails to supervise its employees as to display deliberate indifference to plaintiffs' constitutional rights. *See Reynolds v. Giuliani,* 506 F.3d 183, 192 (2d Cir.2007) (noting that the requirements of "failure to train" claims have been applied more broadly to claims of failure to supervise); *Walker v. City of New York,* 974 F.2d 293 (2d Cir.1992) (discussing failure to train and failure to supervise claims).

As discussed above, the court construes Count Two as raising a claim pursuant to section 1983 for denial of equal protection. Therefore, plaintiffs may not proceed against defendant City on a theory of vicarious liability, nor may the City assert an *Ellerth* affirmative defense. As discussed, to prevail on their claim against the City, plaintiffs must prove the existence of a hostile work environment and that the creation of that environment was pursuant to a municipal policy or custom. Plaintiffs must also prove that the challenged actions were taken under color of law, causation, and damages. *See Roe v. City of Waterbury,* 542 F.3d 31, 36 (2d Cir.2008).

---

**8.** Equal Protection claims may also be brought pursuant to section 1983 against individual supervisory defendants who: (1) participated directly in the alleged constitutional violation; (2) after being informed of the violation, failed to remedy the wrong; (3) created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) were grossly negligent in supervising subordinates who committed the wrongful acts; or (5) exhibited deliberate indifference to plaintiffs' constitutional rights by failing to take action upon receiving information that constitutional violations were occurring. *See Patterson,* 375 F.3d at 229; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).

The City has conceded, for the purposes of its summary judgment Motion, that material issues of fact exist as to whether Otero was acting under the color of state law, whether the workplace constituted a hostile work environment, and whether Otero was the plaintiffs' supervisor. Def.'s Mot. at 8, 11–12. The City does not address causation or damages. Thus, what primarily remains for the court's analysis of the pending motion is whether material issues of fact exist as to whether the creation of the alleged hostile work environment was pursuant to a municipal policy or custom.

### C. Municipal Policy or Custom

The court construes plaintiffs' Count Two as raising theories of liability under section 1983: (1) the failure to properly investigate and address allegations of sexual harassment such that, through this failure, Otero's conduct became an accepted custom or practice of the employer;[9] and (2) the failure to adequately train employees on sexual harassment procedures or to supervise employees so as to display deliberate indifference to the plaintiffs' Equal Protection rights. The court will address each of these theories in turn.[10]

### 1. Failure to Properly Investigate and Address Allegations of Sexual Harassment

■ In *Gierlinger v. New York State Police*, the Second Circuit clarified that

"[s]ection 1983 liability can be imposed upon individual employers ... for failing properly to investigate and address allegations of sexual harassment when through this failure, the conduct becomes an accepted custom of practice of the employer." 15 F.3d at 34. The Second Circuit has not analyzed this theory as extensively as it has analyzed some of the other theories of municipal liability. However, in *Patterson v. County of Oneida*, the Second Circuit suggested that, in order for such a claim to be actionable, a plaintiff must have complained, or supervisors must otherwise have been aware, of the alleged conduct:

> Given the unavailability of *respondeat superior* liability, Patterson's failure to report to a superior officer any of the incidents of which he now complains, and his failure to present any facts ... that the Department or those in charge of the Department were aware of such incidents, Patterson failed to show a genuine issue to be tried as to the existence of a policy or custom based on the mere failure to conduct an investigation.

375 F.3d at 228.

#### a. Events Prior to May 11, 2004

Plaintiffs have presented sufficient evidence to create an issue of fact on whether the City failed to properly investigate and address plaintiffs' allegations of sexual harassment prior to May 11, 2004. First, Otero had a history of sexual harassment

---

**9.** Plaintiffs do not, in their Amended Complaint, include a distinct claim labeled "failure to properly investigate and address allegations of sexual harassment." However, in light of the parties' confusion as to the law applicable to plaintiffs' causes of action, and that the gravamen of plaintiffs' claim, as their Amended Complaint and briefs make clear, is that the defendants violated their Equal Protection rights by failing to adequately investigate and address sexual harassment, the court construes Count Two as raising such a claim in addition to its closely-related failure to supervise and failure to train claims.

**10.** Although plaintiffs present their failure to train and supervise theories together, "[b]ecause these theories emphasize different facts and require different showings in order to establish deliberate indifference, they must be analyzed independently...." *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 127 (2d Cir.2004).

known to the Department. A civilian co-worker accused Otero of grabbing her hand, placing it outside of his pants next to his genitalia, making references to her feeling and tasting his "chocolate," and starting to unzip his pants. The co-worker's complaint was sustained; Otero's eventual discipline, following an arbitrator's decision, amounted to the loss of seventeen holidays. This conduct was also the subject of a federal lawsuit, in which the court granted the City summary judgment. *See Santossio v. City of Bridgeport*, 2004 WL 2381559 (D.Conn. Sept.28, 2004), *aff'd*, 186 Fed.Appx. 130 (2nd Cir.2006). Despite this incident, Otero remained in a supervisory position.

Besides the three plaintiffs in this case, a number of employees in the detective bureau, where Otero worked, became aware of his sexually harassing behavior in the workplace. Unlike the plaintiff in *Patterson*, who did not report incidents to his supervisor, two of the three plaintiffs in this case, Devan and O'Donnell, expressed concerns to supervisors about Otero's conduct in the first few months of 2004. In January 2004, Devan reported Otero's conduct to her supervisor, Detective Vin Verillo, and Verillo also witnessed Otero's conduct personally. He was sufficiently concerned to report the conduct to Lieutenant James Viadero, the number two supervisor in the detective bureau. Yet Viadero initiated no formal investigation of the complaint. Instead, Viadero told Verillo that, if Devan wanted to make a complaint, she should put it in writing. Otherwise, Viadero said, Devan should speak with Otero directly and "dress [him] down." Verillo spoke with Otero and in-

structed him to stop his behavior, but Otero's behavior did not stop.

Similarly, in March 2004, O'Donnell complained to Viadero, her supervisor, that Otero was harassing her. Instead, despite the fact that this was the second complaint of harassment by Otero that had come to Viadero's attention over a period of three months, O'Donnell's verbal complaint was not formally investigated. Rather, Viadero went directly to Otero, and advised him to "stay away from" O'Donnell. He did so in a manner than suggested that he did not take O'Donnell's complaint seriously, explaining, "I don't know about this chick, I don't know if she's nutso, but just stay away from her." [11] Otero continued to harass O'Donnell following her verbal complaint.

Otero's behavior did not stop as a result of Viadero and Verillo's verbal counseling of Otero. Nevertheless, the City failed to initiate an investigation or take other meaningful action to cure the problem until O'Donnell made a written complaint on May 11, 2004. Regardless of whatever written policy the City (and, after March 18, 2004, the Department) had in place, the Department's response to the allegations creates a material issue of fact as to whether the City was aware of, and properly investigated and addressed, Devan and O'Donnell's allegations of sexual harassment made prior to O'Donnell filing her written complaint on May 11, 2004.

### b. Events After May 11, 2004

Plaintiffs have presented sufficient evidence to create an issue of fact on whether the City failed to properly investigate and

---

11. The court again emphasizes that on a motion for summary judgment, it is required to resolve disputed facts in favor of the nonmoving parties when there is evidence in the record to support their allegations. Viadero denies being aware of any sexual harassment prior to May 11, 2004, and specifically denies ever referring to O'Donnell as "nutso" or "chick." Resolving such questions of credibility, however, is a task for the factfinder (i.e., the jury), not the court.

address allegations of sexual harassment following O'Donnell's written complaint on May 11, 2004. In conjunction with O'Donnell's complaint, Devan and O'Donnell spoke with Viadero and Captain Lynn Kerwin about Otero's harassing behavior. Kerwin spent approximately three weeks conducting a preliminary investigation before turning the information over to Internal Affairs on June 4, 2004 for further investigation. Yet even after the written complaint was filed, Otero remained in his supervisory position in the Detective Bureau and continued to harass the plaintiffs through July 22, 2004—a time period of over two additional months *after* O'Donnell filed a written complaint, and approximately six months after Verillo first reported Otero's offending conduct to Viadero. Plaintiffs have presented an issue of fact as to whether, by the time of O'Donnell's written complaint, especially given Otero's past history, the Department needed to act more quickly in order to adequately respond to the complaints.

Following Otero's transfer, Stevens informed Sergeant Joe Adiletta that she, too, had been harassed by Otero, and Adiletta reported this information to Internal Affairs. Yet Internal Affairs did not initiate independent investigations into either Devan's or Stevens' complaints, instead treating incidents involving all three plaintiffs as part of the O'Donnell complaint. Furthermore, Internal Affairs contacted Stevens' husband, a former Bridgeport detective, regarding her complaint of sexual harassment. Though the exact circumstances in which this contact occurred are unclear from the record, plaintiffs have suggested that this contact was improper, and defendants have not sought to explain it. Plaintiffs have presented an issue of fact as to whether Internal Affairs properly processed the complaints of plaintiffs Stevens and Devan.

Finally, plaintiffs have presented an issue of fact as to whether the discipline imposed on Otero was so light as to constitute a failure to adequately address the plaintiffs' sexual harassment allegations. The City sought discipline up to and including termination in this case, and contends that because an independent hearing officer is responsible for the imposition of discipline, the City cannot be held liable for a failure to impose adequate discipline. However, after Otero and the Union appealed the original forty five-day discipline imposed, the City settled the matter for a twenty-day suspension without pay. The City argues that it was obligated to settle the matter because O'Donnell was not willing to voluntarily testify at the arbitration proceeding. O'Donnell's willingness to testify is a fact in dispute; defendants contend that she was not willing to testify, while in her deposition, O'Donnell states that she would have testified if she had been served with a subpoena. Furthermore, the necessity of O'Donnell's testimony is also a fact in dispute; plaintiffs contend that her testimony was not necessary given O'Donnell's prior extensive testimony and the fact that the other two plaintiffs could have testified. Finally, whether or not the City was "obligated" to settle the matter for a twenty-day suspension is a fact in dispute; plaintiffs have offered evidence suggesting that there was an ample basis on which to ground the hearing officer's imposition of a 45–day suspension without pay even without O'Donnell's testimony, while the City contends that because O'Donnell was the primary complainant, the case would have fallen apart without her. These factual disagreements cannot be resolved on summary judgment. In short, plaintiffs have created an issue of fact as to whether the City adequately investigated and addressed plaintiffs' sexual harassment complaints, or so failed to do so that the unconstitutional hostile work

environment became an accepted custom or practice of the City.

### 2. Failure to Supervise or Train

The standards applicable to failure to train and failure to supervise claims are closely related. "*Monell's* policy or custom requirement is satisfied where a local government is faced with a pattern of misconduct and does nothing, compelling the conclusion that the local government has acquiesced in or tacitly authorized its subordinates' unlawful actions." *Reynolds,* 506 F.3d at 192 (citing *Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989)). In *Walker v. City of New York,* the Second Circuit established the circumstances under which a failure to act amounts to deliberate indifference: (1) the City knew to a moral certainty that its employees would confront a given situation; (2) the situation presented the employee with a difficult choice of the type that training or supervision would make less difficult, or there was a history of employees mishandling the situation; and (3) the wrong choice by the city employee would frequently cause the deprivation of plaintiffs' rights. 974 F.2d at 297–98.

### a. Failure to Supervise

■ "[A] failure to supervise claim requires allegations as to the violation itself and policymakers' reaction to it...." *Amnesty Am. v. Town of West Hartford,* 361 F.3d 113, 127 n. 8 (2d Cir.2004). A plaintiff may establish deliberate indifference "by showing that policymaking officials deliberately ignored an obvious need for supervision." *Id.* (citation omitted). As the phrase "deliberate indifference" suggests, a plaintiff cannot prevail merely upon proving a failure to investigate or rectify

the situation; she must demonstrate that such failure "evidences deliberate indifference, rather than mere negligence or bureaucratic inaction." [12] *Amnesty Am.,* 361 F.3d at 128. Plaintiffs must also prove causation; that is, that the "state defendants' inadequate supervision actually caused or was the moving force behind the alleged violations." *Reynolds,* 506 F.3d at 193. In short, for the failure to supervise to trigger liability under section 1983, a plaintiff must:

(1) establish state defendants' duty to act by proving they should have known their inadequate supervision was so likely to result in the alleged deprivations so as constitute deliberate indifference under *Walker;* (2) identify obvious and severe deficiencies in the state defendants' supervision that reflect a purposeful rather than negligent course of action; and (3) show a causal relationship between the failure to supervise and the alleged deprivations to plaintiffs.

*Reynolds,* 506 F.3d at 193.

Evidence that the City took steps to rectify the problem, but failed to do so, cannot insulate it from liability if the City's steps "are proven so meaningless or blatantly inadequate to the task ... notwithstanding [its] nominal supervisory efforts." *Id.* at 196. The focus is on the adequacy of the steps the City took to address the conduct, not on whether the conduct continued. As the Second Circuit has explained, "the extent of state defendants' ultimate success in averting injury cannot be the legal measure of its efforts to do so, as such a standard is tantamount to vicarious liability." *Id.* at 196.

■ Plaintiffs have established a genuine issue of fact to be tried on their failure

---

**12.** While deliberate indifference may be established by "proof of a policymaker's failure to respond to repeated complaints of civil rights violations," such a showing is not required. *Amnesty Am., 361 F.3d at 128.*

to supervise claim. Defendants have conceded that an issue of fact exists as to whether Otero created an unconstitutional hostile work environment. As the court discussed at length in its analysis of plaintiffs' claim of failure to investigate or adequately address sexual harassment, plaintiffs have created an issue of fact as to whether senior police officials were aware of Otero's behavior and failed to adequately supervise him such that his behavior could be ameliorated.

Plaintiffs have offered evidence that the Department was aware of Otero's history of sexual harassment, and that Lieutenant Viadero, the number two supervisor in the detective bureau, was aware of Otero's alleged harassment of two of the three plaintiffs in this case both before and after O'Donnell filed a written complaint on May 11, 2004. Despite this awareness, the Department engaged in minimal efforts to stop Otero from harassing the plaintiffs prior to his transfer on July 22, 2004. In instructing Devan to "dress down" Otero, and in counseling Otero that O'Donnell was "nutso" and that he should just "stay away from her," Viadero may even have exacerbated the harassment by expressing to Otero that the Department did not take it seriously. Therefore, although the Department need not have succeeded in addressing the harassment in order to avoid a failure to supervise claim, plaintiffs have created an issue of fact as to whether the Department's minimal efforts prior to May 11, 2004, and somewhat more substantial efforts between May 11 and July 22, 2004, were "so meaningless or blatantly inadequate to the task" as to demonstrate deliberate indifference. Furthermore, the actions taken by supervisory personnel in this case in response to plaintiffs' complaints—talking to Otero, instructing Devan to "dress down" Otero, reporting to Internal Affairs, failing to remove Otero from his position—were clearly purposeful action rather than potentially negligent inaction; the issue is whether they were an adequate response. In short, plaintiffs have created an issue of fact on their failure to supervise claims.

b. Failure to Train

■ "[A] city's failure to train its subordinates satisfies the policy or custom requirement only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds*, 506 F.3d at 192 (citing *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). A plaintiff must meet *Walker's* three-pronged test to demonstrate deliberate indifference, and ordinarily establishes deliberate indifference by showing "that the officials consciously disregarded a risk of future violations of clearly established constitutional rights by badly trained employees." *Amnesty Am.*, 361 F.3d at 127 n. 8 (citing *City of Canton*, 489 U.S. at 389–90, 109 S.Ct. 1197). To prevail, a plaintiff must also prove causation; that is, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Id.* at 129 (citation and internal quotation marks omitted). Demonstrating "negligent administration of a sound program," or that one or more officers negligently or intentionally disregarded otherwise appropriate training, does not suffice. *Id.* at 129–30.

■ To survive summary judgment on a failure to train claim, a plaintiff must introduce "evidence as to the city's training program and the way in which that program contributed to the violation." *Amnesty Am.*, 361 F.3d at 127 n. 8. Ordinarily, a plaintiff should introduce evidence of "how the training was conducted, how

better or different training could have prevented the challenged conduct, or how 'a hypothetically well-trained officer would have acted' " differently under the circumstances. *Id.* at 130.

Plaintiffs seek to make out a "failure to train" claim under two theories. Plaintiffs' first theory is that the City failed to sufficiently train Otero on the issue of sexual harassment. Plaintiffs argue that the failure to train Otero before 1999 alone demonstrates the City's failure to train. The court disagrees. It is undisputed that Otero received sexual harassment training on February 11, 1999, and June 9, 2000, and that the sexual harassment at issue in this case occurred after those dates. Accordingly, to prevail on their theory, plaintiffs must demonstrate specific ways in which the training Otero received was deficient, and that the deficienc(ies) in the training contributed to Otero's harassment of the plaintiffs. Otero was also trained on April 1, 2004, during the events of this case. Even if plaintiffs can demonstrate that earlier trainings were deficient, therefore, they must also show that the April 1, 2004 training failed to cure the deficiency in order for actions taken after that date to be actionable on a failure to train theory.

Plaintiffs also argue that the training the City gave to Otero was inadequate. Plaintiffs have submitted an expert witness report and supplemental report, dated July 28, 2008 and September 4, 2008. Ex. PP and Ex. 27. The report details the author's opinion of what components are necessary to have effective sexual harassment training, and contends that the City's training was inadequate in several respects. Ex. PP at 7–11. It states that

trainer Charlene Hosticka, who conducted the 1999 and 2000 training, and trainer Robert Gearing, who conducted the 2004 training, had no training in facilitating sexual harassment training. Ex. 27 at 2; Ex. PP at 11–12. It emphasizes that statements in their depositions indicated their inadequate knowledge of sexual harassment training and law. Ex. 27 at 2; Ex. PP at 11–12. It points out that Otero, at his deposition, did not recall the training or content of the Hosticka or Gearing trainings. Ex. PP at 13. Nor could Otero identify or recall handouts he received. *Id.* The report concludes that Otero's statements "raise a concern about whether the training itself was effectively facilitated or whether he took the training seriously." *Id.* Finally, the report states that the frequency of training provided by the City of Bridgeport was inadequate. Ex. 27 at 2.

The City has supplied the court with the materials Hosticka is alleged to have covered in her training. *See* Def.'s Local Rule 56(a)(1) Stmt. at ¶ 71; Ex. FF; Ex. GG. In their Statement of Facts, plaintiffs "Deny" paragraph 71, and cite to a portion of Pablo Otero's testimony not supplied to the court, but the plaintiffs do not deny that training took place.[13] *See* Pls.' Local Rule 56(a)(2) Stmt. at ¶¶ 68–72.

The court has examined plaintiffs' brief, Rule 56(a)(2) Statement, and expert reports. While plaintiffs have identified specific alleged deficiencies in the City's sexual harassment *policies* and offered a detailed analysis of those deficiencies, *see* Ex. PP at 15–23, plaintiffs have not identified specific deficiencies in the *training* offered to Otero. Nor have they offered evidence or argument as to how the defi-

---

**13.** Plaintiffs cite to Exhibit 9, pages 22–26. Exhibit 9 is the deposition of Pablo Otero, but pages 22–26 were not included in the copy of the deposition supplied to the court by either the plaintiffs or the defendant. From the Expert Report of Michele Paludi, it appears that page 24 includes a statement by Otero

that he could not recall, at his deposition on June 4, 2008, the training he received from Hosticka back in 1999 and 2000. Ex. PP at 12. In any case, because this material was not supplied to the court, the court cannot rely upon it.

ciencies in the training may have contributed to Otero's conduct, or how better or different training could have prevented Otero's conduct.

Plaintiffs also contend that the frequency of training itself demonstrates that the training was deficient. Opp'n at 19–20. Plaintiff's expert points out that Otero, in his deposition, could not recall the materials on which he was trained. Ex. PP at 13. Plaintiffs' argument could conceivably have merit if Otero had not received training for many years prior to the actions at issue in this case. However, Otero's failure to recall the materials years later at his deposition does not demonstrate that the trainings themselves were deficient or were too infrequently conducted. Because Otero received three-hour trainings in 1999 and 2000, both within five years of the actions at issue in this case, the court cannot conclude that the infrequency of the training was so egregious as to establish a deliberate indifference to plaintiffs' rights.

Finally, plaintiffs argue that the City's failure to train the plaintiffs, including the failure to post legally required signage regarding the right to be free of sexual harassment, contributed to the deprivation of plaintiffs' constitutional rights. The record demonstrates that plaintiffs did not receive training. However, in a failure to train claim, a court must examine deficiencies in the training provided to the employees alleged to have violated the plaintiffs' constitutional rights, not deficiencies in any training provided to the plaintiffs. *See, e.g., Amnesty Am.*, 361 F.3d at 127 n. 8 (speaking of a "risk of future violations of clearly established constitutional rights *by badly trained employees* ") (emphasis added); *Walker*, 974 F.2d at 298 (explaining that to establish deliberate indifference, a plaintiff must show, *inter alia*, that the wrong choice *by the city employee* would frequently cause the deprivation of

plaintiffs' rights). Even if a claim for poor training of the plaintiffs was cognizable under section 1983, while better training of the plaintiffs could conceivably have enabled them to better act to protect their rights, plaintiffs have failed to link the failure to train the plaintiffs to the constitutional violation perpetrated by Otero.

While the City may not have had a model sexual harassment training program, plaintiffs have not introduced evidence from which a factfinder could conclude that the training Otero received was so deficient as to exhibit deliberate indifference to plaintiffs' constitutional rights, or that the deficiency contributed to the harm suffered by the plaintiffs. Accordingly, to the extent plaintiffs' Count Two states a failure to train claim, the court grants the City summary judgment on that claim.

### III. CONCLUSION

For the foregoing reasons, defendant City's Motion for Summary Judgment (Doc. No. 56) is **GRANTED IN PART** and **DENIED IN PART.**

**SO ORDERED.**